**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
|                        ) | |
|      Plaintiff,            ) | |
|                        ) | |
|        v.               ) | |
|                        ) | Case No. 1:16-cv-425 |
| STATE OF NORTH CAROLINA;   ) | |
| PATRICK MCCRORY, in his official   ) | |
| capacity as Governor of North Carolina;   ) | |
| NORTH CAROLINA DEPARTMENT   ) | |
| OF PUBLIC SAFETY; UNIVERSITY   ) | |
| OF NORTH CAROLINA; and BOARD   ) | |
| OF GOVERNORS OF THE   ) | |
| UNIVERSITY OF NORTH CAROLINA, ) | |
|                        ) | |
|      Defendants.        ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF UNITED STATES' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff United States respectfully submits this memorandum of law in support of its motion for preliminary injunctive relief to enjoin Defendants the State of North Carolina, Governor Patrick McCrory, the North Carolina Department of Public Safety ("DPS"), the University of North Carolina and the Board of Governors of the University of North Carolina (collectively, "UNC") from complying with or implementing Section 1.3 of North Carolina Session Law 2016-3, House Bill 2 ("H.B. 2").

## INTRODUCTION

H.B. 2 denies transgender people access to sex-segregated bathrooms and changing rooms consistent with their gender identity unless they can produce an amended birth certificate. This denial of access constitutes (1) discrimination on the basis of sex in

1

an education program receiving federal funds in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"); (2) a pattern or practice of employment discrimination on the basis of sex and resistance to the full enjoyment of federal employment rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and (3) discrimination on the basis of sex, including gender identity, in programs receiving federal funds in violation of the Violence Against Women Act, 42 U.S.C. § 13925(b)(13) ("VAWA").

The Fourth Circuit's decision in *G.G. v. Gloucester Cnty. Sch. Bd.*, --- F. 3d ---, No. 15-2056, 2016 WL 1567467 (4th Cir. Apr. 19, 2016), *reh'g denied* (4th Cir. June 1, 2016), establishes the United States' strong likelihood of success under Title IX. The controlling logic of that decision and the growing consensus among federal courts about what constitutes sex discrimination further establishes the United States' likelihood of success under Title VII and—coupled with VAWA's express coverage of discrimination based on gender identity—under VAWA. Excluding transgender men and women from bathroom and changing facilities consistent with their gender identity causes significant and irreparable physical, psychological, economic, social, and stigmatic harm to transgender people including the more than 44,000 transgender adults residing in North Carolina who seek to study in state universities, work in state agencies, or simply access those institutions as part of daily civic and cultural life.[1]

---

[1] Andrew R. Flores, et al., *Williams Institute: How many adults identify as transgender in the US?* (2016) (Ex. 1).

Furthermore, Defendants' purported privacy and public safety interests in enacting and implementing H.B. 2 are factually baseless and legally insufficient to justify this discrimination. As the record shows, transgender people in North Carolina have long used bathrooms consistent with their gender identity in private facilities and, before H.B. 2, in public facilities, without precipitating criminal conduct or widespread complaints about the invasion of privacy. H.B. 2 is not merely a solution to a non-existent problem; it is state-sanctioned discrimination that is inflicting immediate and significant harm on transgender individuals. That, along with the balance of equities and the public interest in preventing discrimination, support a preliminary injunction halting compliance with and implementation of H.B. 2.

## BACKGROUND

*Sex, Gender Identity, and Being Transgender*

Transgender people are people whose gender identity is different from the sex assigned to them at birth. Declaration of George R. Brown (June 20, 2016) (Ex. 35) (hereinafter "Brown Dec.") ¶ 23. Generally, sex is assigned on a birth certificate solely on the basis of the appearance of the external genitalia at birth. Brown Dec. ¶¶ 10, 13. As both science and the law recognize, however, an individual's sex consists of multiple factors beyond external genitalia. *See Gloucester*, 2016 WL 1567467, at *6-7 & n.7; Brown Dec. ¶¶ 10-12. Among those factors are hormones, internal reproductive organs, chromosomes, secondary sexual characteristics (i.e., physical features that develop during puberty), brain anatomy, and gender identity, which is a person's internal sense of being male or female. Brown Dec. ¶¶ 11, 20.

3

Gender identity is real; everyone has one. Brown Dec. ¶ 20; Declaration of Lin Fraser (June 20, 2016) (Ex. 36) (hereinafter "Fraser Dec.") ¶ 12. It is usually established at a very young age. Brown Dec. ¶ 21; Fraser Dec. ¶ 12; Declaration of Scott F. Leibowitz (June 20, 2016) (Ex. 37) (hereinafter "Leibowitz Dec.") ¶¶ 14, 16. The best evidence and experts in the field agree that gender identity, including whether or not one is transgender, is at least in part determined by biology. Brown Dec. ¶¶ 24-32. Studies suggest that gender identity is a biological function of the brain, much as hormones are a biological function of endocrine glands. *See* Brown Dec. ¶¶ 25-31. For example, studies have found that transgender women have brain anatomy more similar to non-transgender women than to non-transgender men. Brown Dec. ¶¶ 27-28, 31.

Some transgender people assert at a very young age a gender identity different from their sex assigned at birth. For a variety of reasons including the psychological distress that divergence creates, however, other transgender people may delay assertion of their gender identity until after puberty or even much later in life. Brown Dec. ¶ 36; Leibowitz Dec. ¶ 14. Once transgender people assert their true gender identity, it tends to remain stable; transgender people are not men one day and women another. Leibowitz Dec. ¶¶ 16, 18; Fraser Dec. ¶ 12; Brown Dec. ¶ 38.

For purposes of determining whether a person is a man or a woman, gender identity is the critical factor because it "is the underlying basis for how one presents oneself to others in society in ways that typically communicate what sex one is in our culture." Brown Dec. ¶¶ 22, 32. Indeed, early efforts to treat transgender people by attempting to bring their gender identity into alignment with the sex they were assigned at

4

birth, rather than defining their sex by reference to their gender identity, caused "substantial psychological pain," to the point where such treatment is now considered medically unethical and has been debunked by the Federal Substance Abuse and Mental Health Services Administration. Brown Dec. ¶¶ 53-54.

A range of medical conditions can arise from incongruence among a person's various sex-related characteristics. Brown Dec. ¶¶ 17-19; *see also Gloucester*, 2016 WL 1567467 at *6. Gender dysphoria is a diagnosis reflecting the set of psychological symptoms transgender people suffer as a result of the incongruity between their gender identity and their sex assigned at birth. Brown Dec. ¶ 33; Fraser Dec. ¶ 14; Leibowitz Dec. ¶ 8. There is an objective, scientifically validated, clinical approach to diagnosing gender dysphoria. Brown Dec. ¶¶ 33-41; Leibowitz ¶¶ 11-12, 15-18. In particular, a diagnosis requires six months of consistent assertion of a gender identity opposite to the sex assigned at birth. Brown Dec. ¶ 38.

Surgery is sometimes, but not always, a necessary part of a treatment plan for gender dysphoria. Brown Dec. ¶¶ 49-52. "Most transgender people never undergo sex reassignment surgery (also referred to as gender affirming, or gender confirming, surgery). . . . Other treatments . . . are frequently sufficient to alleviate their gender dysphoria, making invasive, expensive genital surgery unnecessary." Brown Dec. ¶ 49.

Social transition, *i.e.*, living consistent with one's gender identity in all aspects of one's life, "is an important—and often the most important—component of a treatment plan." Brown Dec. ¶ 43; *see also id.* ¶ 44. "Access to sex-segregated bathrooms and changing facilities consistent with gender identity is an essential part of the social role

5

transition, as all people, transgender or not, need to access these facilities multiple times each day."  Brown Dec. ¶ 45; *see also* Fraser Dec. ¶ 24; Leibowitz Dec. ¶ 23.

*North Carolina House Bill 2*

On March 23, 2016, in response to the passage of a Charlotte city ordinance prohibiting discrimination against transgender people in public accommodations, the state legislature enacted and the Governor signed H.B. 2 into law.  H.B. 2 mandates that all "[p]ublic agencies . . . require multiple occupancy bathrooms or changing facilities . . . be designated for and only used by individuals based on their biological sex."  N.C. Session Law 2016-03, sec. 1.3, § 142-760(b).[2]  H.B. 2 defines "biological sex" as "[t]he physical condition of being male or female, which is stated on a person's birth certificate."  *Id.* sec. 1.3 § 143-760(a)(1).  Thus, in the absence of documentation of an amended birth certificate, transgender women are excluded from the women's room and transgender men are excluded from the men's room in covered public agencies.

H.B. 2 permits, but does not require, public agencies at their discretion to provide "accommodations such as single occupancy bathrooms or changing facilities upon a person's request due to special circumstances"—including, presumably, the request of transgender people for access to single-occupancy facilities when they are barred from multiple-occupancy ones consistent with their gender identity. *Id.* sec 1.3, § 143-760(c). But "in no event shall that accommodation result in the public agency allowing a person to use a multiple occupancy bathroom or changing facility designated under subsection

[2] H.B. 2 further defines "public agencies" to include, among other entities, the state executive, judicial, and legislative branches, including the University of North Carolina system.  *Id.* sec. 1.3 § 142-760(a)(2) & (4).

(b) of this section for a sex other than the person's biological sex"—meaning, that in no event shall any "accommodation" include allowing a transgender woman or man who does not have an amended birth certificate the same access other women and men have to facilities that correspond with their gender identity. *Ibid*.

Defendants are implementing section 1.3 of H.B. 2. On April 12, 2016, Governor McCrory issued an executive order affirming that "every multiple occupancy restroom, locker room or shower facility located in a cabinet agency must be designated for and only used by persons based on their biological sex."[3]

On April 5, 2016, UNC's President directed that "University institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex."[4] On April 13, 2016, in response to a request for information from the United States, UNC's President affirmed that "the University is specifically covered by H.B. 2 and is required as a public agency to comply with its applicable portions, including the provisions related to multiple-occupancy bathrooms and changing facilities."[5]

In public statements after the passage of H.B. 2, UNC's President explained that as "a state office holder who is charged with upholding the laws of this state[,] . . . [I am]

---

[3] N.C. Exec. Order 93 § 3 (Ex. 27).

[4] Memorandum from Margaret Spellings, President, Univ. of N.C., to Chancellors 1 (Apr. 5, 2016) (hereinafter "Spellings Mem.") (Ex. 2).

[5] Letter from Margaret Spellings, President, Univ. of N.C., to Shaheena Ahmad Simons, Acting Chief, U.S. Dep't of Justice, Civil Rights Div., Educ. Opportunities Section 3 (Apr. 13, 2016) (Ex. 3).

not in a position to pick and choose which laws."[6] UNC's President also communicated to the UNC Board of Governors that "[a]s a state agency this university and its officers are expected and will follow HB2 and every other law of this state."[7] Several UNC campuses have also issued specific statements explaining to campus communities that they must comply with H.B. 2.[8] UNC has also "provided information about the location of single-occupancy bathrooms" to people on campus.[9]

This message about H.B. 2's validity and application to its campuses unquestionably has reached UNC's students. *See* Declaration of C.W. (July 1, 2016) (Ex. 39) (hereinafter "C.W. Dec.") ¶ 24 ("the President of the University of North Carolina system said that the system is following the law in complying with H.B. 2."); Declaration of H.K. (June 28, 2016) (hereinafter "H.K. Dec.") ¶ 18 ("I understand that the University of North Carolina is a State school, and therefore has to follow State law, including H.B.

---

[6] Blake Hodge, *UNC President Margaret Spellings Clarifies Stance on HB2*, CHAPELBORO (Apr. 8, 2016, 3:34 PM) (Ex. 4).

[7] Jess Clark, *UNC Board Members Concerned About HB2*, WUNC (Apr. 16, 2016) (Ex. 5).

[8] THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, MESSAGE FROM UNIVERSITY LEADERS: UPDATE ON HOUSE BILL 2 (Apr. 8, 2016) (Ex. 6) ("the law relating to public restrooms and changing facilities does apply to the University."); APPALACHIAN STATE UNIVERSITY, AN UPDATE ON PUBLIC FACILITIES PRIVACY & SECURITY ACT (HB2) DEMONSTRATIONS (Apr. 12, 2016) (Ex. 7) (Appalachian State is "required to comply with the laws of our state"); Bradley Lucore, THE WESTERN CAROLINA JOURNALIST, *HB2 creates "chilling effect" on higher education* (Apr. 15, 2016) (Ex. 8) (quoting Western Carolina University's Chancellor, David Belcher, explained further that H.B. 2 is "a state law at this point and Western Carolina University is obligated to follow the law, and in fact I have sworn to uphold the law of the state of North Carolina, as has the president of the UNC system. We have no choice on that.").

[9] *See* Doc. 46 at 11; NORTH CAROLINA STATE UNIVERSITY, HB2 UPDATE: IMPACTS ON NC STATE, (Ex. 9) (providing a map of single-occupant toilets).

2."); C.W. Dec. ¶ 19 ("the Chancellor sent out a list of these bathrooms to the entire student body immediately after H.B. 2 passed").

As recently as May 9, 2016, UNC's President confirmed that UNC "must adhere to laws duly enacted by the State's General Assembly and Governor."[10]  The May 9 Statement unequivocally confirmed that "HB2 remains the law of the State, and the University has no independent power to change that legal reality."  *Id.*

### Enforcement Action by the United States

On May 4, 2016, the United States notified all Defendants that their compliance with and implementation of Section 1.3 of H.B. 2 violated federal non-discrimination requirements.[11]  In addition to being subject as employers to Title VII, UNC receives Federal funding that subjects it to the non-discrimination provisions of Title IX and VAWA, and DPS receives Federal funding that also subjects it to the non-discrimination provision of VAWA.  *See, e.g.*, Doc. 48-1 (Declaration of Nadine M. Neufville (June 18, 2016)); Doc. 32 (Answer, ¶¶ 8, 9).  The United States requested that Defendants agree not to implement Section 1.3 of H.B. 2 and to advise transgender individuals that they are permitted access to multiple-occupancy bathrooms and changing facilities consistent with

---

[10] Public Statement from Margaret Spellings, President, Univ. of N.C (May 9, 2016) (Ex. 10).

[11] Letter from Vanita Gupta, Principal Deputy Assistant Attorney Gen., U.S. Dep't of Justice, Civil Rights Div., to Pat McCrory, Governor, State of N.C. (May 4, 2016) (Ex. 11); Letter from Vanita Gupta, Principal Deputy Assistant Attorney Gen., U.S. Dep't of Justice, Civil Rights Div., to Margaret Spellings et al., President, Univ. of N.C. (May 4, 2016) (Ex. 12); Letter from Vanita Gupta, Principal Deputy Assistant Attorney Gen., U.S. Department of Justice, Civil Rights Div., to Frank L. Perry, Secretary, Dep't of Pub. Safety, State of N.C. (May 4, 2016) (Ex. 13).

their gender identity, as required by federal law. The United States informed Defendants that it would sue if Defendants failed to comply with federal non-discrimination law.

The United States filed suit on May 10, 2016. No Defendant has since demonstrated compliance with federal requirements with respect to H.B. 2.

## QUESTIONS PRESENTED

1.      Whether the United States is likely to succeed on one or more of its claims that Defendants' compliance with and implementation of Section 1.3 of H.B. 2 violates Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and its implementing regulations, 28 C.F.R. Pt. 54, 34 C.F.R. Pt. 106; Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and the Violence Against Women Reauthorization Act of 2013 ("VAWA"), 42 U.S.C. § 13925(b)(13).

2.      Whether Defendants' compliance with and implementation of Section 1.3 of H.B. 2 creates a probability of irreparable harm.

3.      Whether the balance of equities supports issuing an injunction halting Defendants' compliance with and implementation of Section 1.3 of H.B. 2.

4.      Whether an injunction halting Defendants' compliance with and implementation of Section 1.3 of H.B. 2 would be in the public interest.

## ARGUMENT

The United States requests preliminary injunctive relief to enjoin Defendants' compliance with and implementation of Section 1.3 of H.B. 2. To obtain a preliminary injunction, the United States must demonstrate a likelihood of success on the merits on one or more of its three claims, a likelihood of irreparable harm in the absence of preliminary relief, a balance of equities that tips in its favor, and that the public interest would be served by injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008).

H.B. 2 requires public agencies to bar transgender people from bathrooms and changing facilities that correspond with their gender identity unless they can produce an amended birth certificate. This exclusion violates Title IX under the Fourth Circuit's reasoning in *G.G. v. Gloucester Cnty. Sch. Bd.*, --- F. 3d ---, No. 15-2056, 2016 WL 1567467 (4th Cir. Apr. 19, 2016), *reh'g denied* (4th Cir. June 1, 2016), which afforded controlling weight to the Department of Education's interpretation of its Title IX regulations to require education programs and activities receiving federal funds to permit transgender students access to facilities consistent with their gender identity. H.B. 2 also violates Title VII and VAWA because barring transgender employees from bathrooms and changing facilities consistent with their gender identity is unlawful sex discrimination, and VAWA explicitly clarifies that discrimination based on gender identity is covered by its non-discrimination mandate. In addition, H.B. 2 is causing irreparable stigmatic, psychological, economic, social, and physical harm to transgender people; the equities weigh in favor of granting preliminary injunctive relief to remedy

11

these violations of federal non-discrimination law; and such relief would serve the public interest in enforcing the nation's civil rights laws.

## I. The United States is Likely to Succeed on Its Claims that Defendants' Compliance with and Implementation of H.B. 2 Violates Federal Civil Rights Laws.

To demonstrate a likelihood of success on the merits, the United States must make a "clear showing" that it is likely to succeed at trial, but "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). In light of controlling authority on Title IX and the weight of authority on Title VII, and the plain language of VAWA, the United States more than satisfies this standard.

### A. The Fourth Circuit's Controlling Decision in *G.G. v. Gloucester* Establishes a Strong Likelihood of Success on the United States' Title IX Claim.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Regulations promulgated by the Department of Justice and the Department of Education, both of which enforce Title IX, state that funding recipients "may provide separate toilet, locker room, and shower facilities on the basis of sex" without running afoul of Title IX, as long as the "facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex." 28 C.F.R. 54.410 (Department of Justice); 34 C.F.R. 106.33 (Department of Education). These regulations do not address how funding recipients should treat transgender people in the context of sex-segregated facilities. Interpretive guidance issued by both agencies,

12

however, clarifies that funding recipients who choose to provide sex-segregated facilities must treat transgender individuals consistent with their gender identity. That is, "a school must not treat a transgender student differently from the way it treats other students of the same gender identity." Dear Colleague Letter, U.S. Departments of Justice and Education (May 13, 2016) at 2 (Ex. 14). This reflects the consistent interpretation of both Departments for several years.[12]

The Fourth Circuit has deferred to this interpretation, affording it controlling weight. In *Gloucester*, 2016 WL 1567467, a transgender male high school student sought access to the school boy's bathroom in the face of a school policy limiting such access to students' "corresponding biological sex." The Fourth Circuit held that the Department of Education's interpretation of its Title IX regulation to require providing transgender students access to sex-segregated facilities consistent with their gender identity is entitled to controlling weight under *Auer v. Robbins*, 519 U.S. 452 (1997). The Fourth Circuit determined that agency regulations permitting sex-segregated facilities under Title IX are ambiguous with respect to transgender people. *Gloucester*, 2016 WL 1567467 at \*6.

---

[12] *See also* Brief for the United States as *Amicus Curiae* at 8-22, *G.G.* v. *Gloucester Cnty. Sch. Bd.*, No. 15-2056 (4th Cir. Oct. 28, 2015) (stating that "although recipients may provide separate restrooms for boys and girls, when a school does so, it must treat transgender students consistent with their gender identity") (Ex. 15); Letter from James A. Ferg-Cadima, OCR Acting Deputy Assistant Secretary of Policy (Jan. 7, 2015) (same) (Ex. 16); Resolution Agreement Between the Arcadia Unified School District, the U.S. Department of Education, Office for Civil Rights, and the U.S. Department of Justice, Civil Rights Division 3 (July 24, 2013) (requiring a school district to provide a transgender student with access to the sex-specific facilities that corresponded with the student's gender identity) (Ex. 17); U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* 25 (Dec. 1, 2014) (OCR Single-Sex Q&A) (Ex. 18); U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 5 (Apr. 29, 2014) (Ex. 19).

Examining the Department of Education's regulation specifically, the court reasoned that, "[a]lthough the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms." *Id.* Specifically, the regulation "assumes a student population composed of individuals of what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction," and therefore "sheds little light on how exactly to determine the 'character of being either male or female' where those indicators diverge," as they do with transgender individuals. *Id.* at *7.

In light of that ambiguity, the Fourth Circuit held that the Department of Education's interpretation of its Title IX regulation was reasonable, consistent with the text of Title IX and the regulation, and the product of the agency's fair and considered judgment. *Id.* at *6-*8. The meaning of "sex" reflected in the Gloucester school district's policy was contrary to the federal agency's interpretation, which the court held was permitted by "the varying physical, psychological, and social aspects—or, in the words of an older dictionary, 'the morphological, physiological, and behavioral peculiarities'—included in the term 'sex.'" *Id.* at *7. By deferring to the agency interpretation, which, like the Department of Justice's interpretation of its identical Title IX regulation, is premised on a view that sex discrimination includes discrimination against transgender people, the court established that when recipients of Federal financial assistance separate individuals based on sex, compliance with Title IX requires those

14

recipients, in the context of access to bathrooms and changing facilities, to treat transgender men as men and transgender women as women.

Gloucester dictates the same result here. As the Fourth Circuit noted, the question at the "heart of th[e Gloucester] appeal is whether Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity." 2016 WL 1567467 at * 1. By deciding that question in the affirmative, Gloucester does not simply establish the likelihood of success on the United States' Title IX claim here but ensures it. A conclusion that Title IX permits H.B. 2's restriction of sex-segregated facilities to persons whose sex designation on their birth certificate matches the sign on the facility door cannot be reconciled with the Fourth Circuit's decision. Id. at *8. This conclusion is underscored by the decision of the Gloucester district court on remand to summarily issue a preliminary injunction preventing the Gloucester school district from denying the plaintiff access to bathrooms consistent with his gender identity. G.G. v. Gloucester Cnty. Sch. Bd., Doc. 69, No. 4:15-cv-54 (E.D. Va. June 23, 2016) (Ex. 20).

Although the plaintiff's claim in Gloucester presented the issue of access to bathrooms only, because he did not use school changing facilities, the reasoning of Gloucester's holding applies to changing facilities with equal force. The Title IX regulation at issue in Gloucester addresses "toilet, locker room, and shower facilities," 34 C.F.R. 106.33, and there is no basis for parsing that regulation to afford conflicting levels of deference to the agencies' uniform interpretation that both bathrooms and changing facilities must be provided to transgender students consistent with their gender identity.

15

Moreover, as the Fourth Circuit noted, the Department of Education's interpretation was afforded deference in part because it is "in line with the existing guidances and regulations of a number of federal agencies," *Gloucester*, 2016 WL 1567467 at *7-8, and those "existing guidances and regulations" do not distinguish between bathrooms and other sex-segregated public spaces in the requirement to provide access to transgender people consistent with gender identity.[13] There is, therefore, no basis for the Court to draw such a distinction either in terms of the deference owed to agency interpretation or in terms of the requirements of Title IX and its regulations.

Thus, given the Fourth Circuit's controlling decision and the weight of additional agency authority interpreting funding recipients' obligations under Title IX, the Court should find that the United States is likely to succeed on the merits of its Title IX claim.[14]

### B. The United States is Likely to Succeed on Its Title VII Claim.

Title VII makes it "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . or . . . to limit, segregate or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his

---

[13] *See infra* note 17 and accompanying text.

[14] Although the Court need not reach this question in light of the controlling authority regarding the regarding the requirement of deference to agency interpretation established by the Fourth Circuit's decision in *Gloucester*, the Court could also, for the reasons stated in Parts I.B.1 and 2, *infra*, find, as a matter of statutory interpretation and irrespective of the deference owed to agency interpretations of Title IX regulations, that the United States is likely to succeed on its claim that Defendants' compliance with and implementation of H.B. 2 violates Title IX's prohibition on sex discrimination.

16

status as an employee, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a).

The weight of legal authority holds that discriminating against transgender employees is discrimination "because of . . . sex" under Title VII. Denying transgender people access to bathrooms and changing facilities consistent with their gender identity discriminates in the provision of a term or condition of employment and deprives transgender employees of employment opportunities and adversely affects their status, in violation of Title VII. Indeed, given that courts have traditionally considered Title VII and Title IX's sex discrimination prohibitions to be consistent,[15] it would be incongruous to find that Title VII permits employers in the Fourth Circuit to bar transgender men and women from workplace facilities consistent with their gender identity when recipients of federal funding under Title IX cannot. *See Gloucester*, 2016 WL 1567467 at *6-7. Thus, compliance with and implementation of H.B. 2 by the State, UNC, and DPS constitutes a pattern or practice of discrimination against their employees. Separately, the State and Governor are engaged in a pattern or practice of resistance to the full enjoyment of equal employment rights by all public employees by requiring all public agency employers to follow H.B. 2's mandate of discrimination.

---

[15] *See, e.g.*, *Franklin* v. *Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (rule that sexual harassment constitutes sex discrimination under Title VII applies equally to Title IX); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."); *Preston v. Virginia ex rel. New River Comm. Coll.*, 31 F.3d 203, 207-08 (4th Cir. 1994) (holding that Title IX discrimination claim should be interpreted in accordance with principles governing Title VII).

1. <u>Discrimination Against Transgender People is Discrimination Because of Sex</u>.

Treating transgender people differently from non-transgender people because they are transgender constitutes differential treatment "because of . . . sex" under Title VII. As Judge Davis recognized in *Gloucester*, "the weight of circuit authority" recognizes that "discrimination against transgender individuals constitutes discrimination 'on the basis of sex'" under Title IX and "analogous statutes" including Title VII. *Gloucester*, 2016 WL 1567467, at *12 (Davis, J., concurring) (citing cases); *id.* at *14 (Davis, J., concurring) (noting that "the weight of authority establishes that discrimination based on transgender status is already prohibited by the language of federal civil rights statutes, as interpreted by the Supreme Court.").

Since the Supreme Court's decision in *Price Waterhouse v. Hopkins*, it has been well established that sex discrimination under Title VII includes differential treatment based on "sex-based considerations." 490 U.S. 228, 242 (1989) (plurality). In *Price Waterhouse*, the Supreme Court held that an accounting firm violated Title VII when it denied a female senior manager partnership because she was considered "macho," "aggressive" and insufficiently "feminine[]." *Id.* at 235. In doing so, *Price Waterhouse* rejected the notion that "sex" discrimination occurs only in situations in which an employer prefers a man over a woman (or vice versa); rather, a prohibition on sex discrimination encompasses any differential treatment based on "sex-based considerations." *Id.* at 242.

A transgender person's transgender status is unquestionably a "sex-based consideration." Indeed, the very definition of being "transgender" is that one's gender identity does not match one's birth-assigned sex. *See Gloucester*, 2016 WL 1567467, at *1; Brown Dec. ¶ 20. Thus, discrimination against transgender people because they are transgender denies them an opportunity or benefit based on a consideration related to sex. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000). Indeed, denying transgender people benefits based on their transgender status "*literally* discriminat[es] 'because of … sex.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008). This is true whether viewed as discrimination based on the divergence between gender identity and the sex assigned at birth or as discrimination due to an individual's gender transition. As the *Schroer* court aptly analogized, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" even if the employer "harbors no bias toward either Christians or Jews but only 'converts,'" because "[n]o court would take seriously the notion that 'converts' are not covered by the statute." *Id*. at 306. By the same logic, discrimination against people because they have "changed" their sex, *i.e.*, they are living as a different sex from the one assigned to them at birth, is a "clear case" of discrimination because of sex. *Id.*

Furthermore, discriminating against transgender women and men because they do not satisfy H.B. 2's purportedly "biological" definition of who counts as "women" and "men" impermissibly discriminates against transgender individuals based on sex stereotypes. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (recognizing "a congruence between discriminating against transgender and transsexual

19

individuals and discrimination on the basis of gender-based behavioral norms"); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (holding transgender people are a protected class under Title VII). The Supreme Court has noted that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group," *Price Waterhouse*, 490 U.S. at 251, yet H.B. 2 demands that transgender people match certain sex-based stereotypes required by that statute for admission to sex-segregated bathrooms and changing facilities. Just as the plaintiff in *Price Waterhouse* was not promoted because she confounded her employer's stereotypical notion of womanhood, so, too, are transgender people adversely treated by H.B. 2 because they do not conform to the statute's stereotypical notion of what makes someone a "real" man or "real" woman.

As Judge Davis noted in *Gloucester*, 2016 WL 1567467, at *12 (Davis, J., concurring), the conclusion that discrimination against transgender people is sex discrimination rests on a substantial and growing body of legal authority arising primarily in the employment context. *See, e.g.*, *Glenn*, 663 F.3d at 1316 (upholding summary judgment for plaintiff alleging termination based on transgender status); *Barnes*, 401 F.3d at 737 (upholding trial verdict in favor of plaintiff in a Title VII claim of discrimination against a transgender employee); *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (holding that discrimination based on "transsexual" status states a claim under Title VII); *Lewis v. High Point Regional Health Sys.*, 79 F. Supp. 3d 588 (E.D.N.C. 2015) (holding that discrimination against transgender employees states a claim under Title VII); *Finkle v. Howard Cnty.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014) (same); *Schroer*,

577 F. Supp. 2d at 306 (holding after trial that employment discrimination against a transgender individual is sex discrimination); *Mitchell* v. *Axcan Scandipharm, Inc.*, No. 05-CV-243, 2006 WL 456173, at *2 (W.D. Pa. Feb. 17, 2006) (holding that a transgender woman stated a claim under Title VII by alleging she was fired because she announced her intent to transition from male to female); *Tronetti v. TLC HealthNet Lakeshore Hosp.*, No. 03-CV-0375, 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003) (holding that a transgender employee alleging constructive termination following gender confirmation surgery stated a claim under Title VII).

This employment discrimination case law is further bolstered by cases in other statutory contexts interpreting sex discrimination to cover discrimination against transgender people, based on legal reasoning that applies equally to Title VII (as well as VAWA, discussed below). *See, e.g.*, *Schwenk*, 204 F.3d 1187 (holding that sexual assault motivated by a person's transgender status states a claim under a statute prohibiting crimes "committed because of gender or on the basis of gender" and specifically noting that "Congress intended proof . . . to proceed in the same way that proof of discrimination on the basis of sex or race is shown under Title VII"); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) (holding that discrimination against a transgender person states a claim under Section 1557 of the Affordable Care Act, which incorporates Title IX's prohibition on sex discrimination).

Consistent with these legal rulings, the Equal Employment Opportunity Commission ("EEOC") has concluded that "intentional discrimination against a

transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex'" in violation of Title VII. *Lusardi v. Department of the Army*, No. 0120133395, 2015 WL 1607756, at *7, *9 (EEOC Apr. 1, 2015) (finding that an employer discriminated on the basis of sex in violation of Title VII when it barred a transgender complainant from using the restroom consistent with her gender identity); *Macy v. Department of Justice*, No. 0120120821, 2012 WL 1435995, at *11 (EEOC Apr. 20, 2012) (same with respect to refusal to hire a transgender person).

The EEOC has filed several complaints in federal court advancing this interpretation—*see, e.g.*, *E.E.O.C.* v. *Lakeland Eye Clinic P.A.*, No. 8:14-CV-2421 (M.D. Fla. Sept. 25, 2014); Complaint, *E.E.O.C.* v. *R.G. & G.R. Harris Funeral Homes Inc.*, No. 2:14-CV-13710 (E.D. Mich. Sept. 25, 2014)—at least one of which involved a claim that a private employer violated Title VII when it "refused to allow" a transgender female employee "to use the women's restroom and forced her to use the men's restroom instead." Complaint at 12, *E.E.O.C.* v. *Deluxe Fin. Servs., Inc.*, No. 0:15-CV-2646 (D. Minn. June 4, 2015).

To be sure, some federal courts have construed prohibitions on sex discrimination to exclude discrimination against transgender people. *See, e.g.*, *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007); *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084-1085 (7th Cir. 1984). But as other circuit courts have noted, these decisions simply cannot be reconciled with the Supreme Court's decision in *Price Waterhouse*, and therefore should not be afforded any weight by this Court. *Smith*, 378 F.3d at 573 (noting that *Price Waterhouse* "eviscerated" the approach of cases denying that discrimination

22

against transgender people is sex discrimination); *Schwenk*, 204 F.3d at 1201 (noting that "[t]he initial judicial approach" to sex discrimination "has been overruled by the logic and language of *Price Waterhouse*").[16]

Likewise, the likelihood that Congress did not contemplate Title VII's application to transgender people at the time of enactment does not outweigh the many cases holding that discrimination against a transgender person constitutes sex discrimination. Even if the Congress that enacted Title VII in 1964 did not have transgender individuals in mind, the same can be said for other conduct that is now well established as prohibited sex discrimination under Title VII. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). As the Supreme Court explained in *Oncale*, "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII." *Id.* at 79. Nonetheless, the Court emphasized that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of

---

[16] Although the Tenth Circuit's decision in *Etsitty* post-dates the Supreme Court's decision in *Price Waterhouse*, that circuit's attempt to distinguish the Supreme Court's decision is unpersuasive, turning on that circuit's understanding of the "plain meaning" of "discrimination based on sex" as limited to discrimination based on anatomical difference notwithstanding the Supreme Court's rejection of that interpretation in *Price Waterhouse*. Moreover, the Tenth Circuit itself acknowledged its decision may have a shelf life, in that "[s]cientific research may someday cause a shift in the plain meaning of the term 'sex' so that it extends beyond the two starkly defined categories of male and female," emphasizing that its decision was made "[a]t this point in time and with the record and arguments before this court . . . ." 502 F.3d at 1222. As the Fourth Circuit held in *Gloucester* when it acknowledged "the varying physical, psychological, and social aspects—or, in the words of an older dictionary, 'the morphological, physiological, and behavioral peculiarities'—included in the term 'sex,'" the plain meaning of sex cannot be reconciled with the Tenth Circuit's limited, and now clearly erroneous, view. *Gloucester*, 2016 WL 1567467 at *7.

23

our legislators by which we are governed." *Id.* Excluding from the statute's purview something that falls within its text simply because Congress may not have contemplated it "is no longer a tenable approach to statutory construction." *Schroer*, 577 F. Supp. 2d at 307.

The legal conclusion that discrimination based on sex includes discrimination on account of transgender status is bolstered by an informed understanding of the real-life meaning of the term "sex." As both science and the Fourth Circuit recognize, an individual's sex consists of multiple factors, which may not always be in alignment. *See Gloucester*, 2016 WL 1567467, at *6-7 & n.7; *see also* Brown Dec. ¶¶ 10-22. Among those factors is gender identity, which is an individual's internal sense of being male or female. Brown Dec. ¶¶ 11, 20. For purposes of determining whether a person is a man or a woman, gender identity is the critical factor because it "is the underlying basis for how one presents oneself to others in society in ways that typically communicate what sex one is in our culture." Brown Dec. ¶¶ 22, 32. Indeed, early efforts to "cure" transgender people by ignoring their gender identity and forcing them to live as the sex they were assigned at birth notoriously failed and resulted in "substantial psychological pain," to the point where such treatment is now considered medically unethical. Brown Dec. ¶¶ 53-54. Thus, it would be contrary to basic scientific and medical understanding of the meaning of sex to exclude gender identity from the legal definition of sex.

Acknowledging that gender identity is the dispositive determinant of sex does not obliterate the notion of sex or mean that any person can claim to be a "man" or a "woman" on a whim. Gender identity, contrary to Defendants' misconceptions, is not a

24

mere psychological fancy or "a lifestyle choice." Brown Dec. ¶ 24; *see also supra* Background Section; Brown Dec. ¶¶ 20-21; Fraser Dec. ¶ 12; Leibowitz Dec. ¶¶ 14, 16. In fact, gender identity—and thus, whether or not one is transgender—is, at least in part, a question of biology, as studies suggest that gender identity is a biological function of the brain, much as hormones are a biological function of endocrine glands. *See* Brown Dec. ¶¶ 24-32. It is wrong, therefore, to juxtapose gender identity in opposition to other biological aspects of sex such as anatomy or chromosomes, which, as discussed further below, are themselves not the clear-cut factors Defendants assume them to be. Gender identity is no less a legitimate biological concept than those other attributes. There is, therefore, no basis for privileging anatomy as the sole basis for determining sex.

Indeed, defining sex to exclude gender identity and turn exclusively on anatomy is both medically inaccurate and legally problematic. Brown Dec. ¶¶ 11, 19. The notion that sex can be reduced to a simple matter of genitalia or genes, or that sex assigned at birth is a clear-cut determinant of sex, is vividly disproven by a range of conditions that result when sex-related factors diverge. For example, "[b]abies with much higher levels of androgens early in life may appear to have male genitalia at birth even though they have typically female chromosomes and a female gender identity." Brown Dec. ¶ 17. Some other people are born with chromosomal abnormalities that make it impossible to classify their sex based on chromosomes. Brown Dec. ¶ 18. These phenomena illustrate how H.B. 2's reduction of "sex" to anatomy cannot be defended as an objectively valid way to define sex. *See* Brown Dec. ¶ 10. As the Fourth Circuit noted, reducing "sex" solely to genitalia creates unresolvable ambiguities about how laws governing sex

25

discrimination and the lawfulness of sex-segregated facilities would apply to "an intersex individual," and "an individual born with X-X-Y chromosomes," and "an individual who lost external genitalia in an accident." *Gloucester*, 2016 WL 1567467, at *6.

Collectively, these facts belie Defendants' attempts to argue that challenging H.B. 2 amounts to "an assault on the fundamental legal and social understanding of what distinguishes men from women." Doc. 8-1 ¶ 8. Defendants' portrayal of what distinguishes men from women is grounded in stereotype rather than reality, and their legal theory fails to grapple with the controlling authority of *Price Waterhouse*. An informed understanding of the complexities of sex, the meaning and significance of gender identity, and the reality of being transgender supports the substantial legal authority cited above on which the Court should rely to conclude that discrimination against transgender people is sex discrimination.

2.    Denying Access to Sex-Segregated Bathrooms and Changing Facilities Consistent with Gender Identity is Unlawful Discrimination under Title VII.

Denying transgender employees access to sex-segregated bathrooms and changing facilities consistent with their gender identity violates Title VII both because it discriminates with respect to a term, condition, or privilege of employment, *see* 42 U.S.C. § 2000e-2(a)(1), and because it limits, segregates, or classifies employees in a way that deprives them of opportunities and adversely affects them, 42 U.S.C. § 2000e-2(a)(2). H.B. 2 denies transgender men and women the same access to sex-segregated bathrooms and changing facilities consistent with their gender identity that other employees take for

granted, and thereby causes significant psychological, stigmatic, economic, social, and physical harms.

As the EEOC recognized in *Lusardi*, both "depriv[ation] . . . of common locker and shower facilities that non-transgender employees could use" and "[e]qual access to restrooms is a significant, basic condition of employment." 2015 WL 1607756 at *9 & n.7; *see also Bell v. Florida Highway Patrol*, 325 F. App'x 758, 760 (11th Cir. 2009) (reversing dismissal of a Title VII claim and holding that a requirement for black employees to use separate restrooms from white employees stated a claim "with respect to conditions of employment"); *Baker v. John Morrell & Co.,* 220 F. Supp. 2d 1000, 1011, 1014 (N.D. Iowa 2002) (holding that denial of equal access to bathroom facilities alters the terms and conditions of employment); *cf. DeClue v. Central Illinois Light Co.,* 223 F.3d 434, 436 (7th Cir. 2000) (holding that denial of access to bathrooms could violate Title VII, but plaintiff waived the claim by failing to properly raise it).

When employers provide segregated bathrooms and changing facilities on equal terms for women and men, that sex-based classification does not in itself adversely affect employees or deny employment opportunities to either sex. It does not stigmatize women or men, or suggest that either is not worthy of equal status. It does not, in short, disadvantage any person on the basis of sex. *See* 28 C.F.R. 54.410; 34 C.F.R. 106.33.

But H.B. 2 does not simply segregate bathrooms and changing facilities between men and women. It instead seeks to exclude a particular group of women from using facilities reserved for women and likewise for men. This exclusion of transgender people from workplace bathroom and changing facilities consistent with their gender identity

27

causes concrete and demonstrable harm, and therefore is a facially invalid sex-based classification in violation of Title VII. First, H.B. 2's mandate that employers exclude transgender men and women from bathroom and changing facilities that correspond with their gender identity stigmatizes transgender people, sending the signal that they are innately inferior to other "real" men or women. That message itself causes harm. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[A]s we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.") (internal citations omitted); *see also, e.g., Romer v. Evans*, 517 U.S. 620, 633-34 (1996). The EEOC has emphasized the particular damage such stigmatic harm does to transgender employees, noting that denying them use of a facility "that other persons of [his or] her gender [are] freely permitted to use" not only denies them "access to a resource open to others," but also deprives them of "equal status, respect, and dignity in the workplace," and thereby functions to negate their "very identity." *Lusardi,* 2015 WL 1607756 at *10.

Experts in the field amplify this point, drawing on their extensive experience working with transgender people. "Forbidding individuals from using restrooms and other gender segregated facilities consistent with their gender identities sends the message that their identity is invalid, wrong, or problematic. This negatively impacts their self-esteem, self-worth, ability to trust in others, and willingness to go out into the

world." Leibowitz Dec. ¶ 25; *see also* Fraser Dec. ¶ 25 ("[B]eing denied access to gender identity-appropriate facilities can be traumatizing for transgender individuals," because it "stigmatizes" them); *id.* ¶ 36 ("Laws that limit an individual's access to bathrooms and changing facilities consistent with their gender identity can have the effect of making people feel that they do not belong in the world.").

Second, H.B. 2 causes psychological harm by denying an essential part of a transgender person's identity. Transgender people struggle to "be seen by the world as they see themselves" and rely on "social feedback," including "[a]ccess to gender identity-appropriate restrooms and locker rooms," to avoid deep psychological harm including "anger, self-hatred, depression, and anxiety." Fraser Dec. ¶¶ 20-26; *see also* Brown Dec. ¶ 57 ("Being denied access to gender appropriate single-sex bathrooms and changing facilities is one of the most common and acute forms of discrimination that transgender people experience. As such, restrictive restroom and locker room policies can contribute to negative general health and mental health outcomes for transgender people.").

For those transgender people who are diagnosed with gender dysphoria, denying access to bathroom and changing facilities consistent with their gender identity causes particularly acute psychological damage, as it interferes with medically necessary treatment, particularly the "social role transition"—*i.e.,* living in all aspects of one's life as one's gender identity—and risks "depression, anxiety, trauma and isolation that exacerbates the mental health issues associated with Gender Dysphoria." Brown Dec. ¶ 45; *see also id.* ¶¶ 43-45; Leibowitz Dec. ¶ 19-20, 23-25, 29; Fraser Dec. ¶¶ 17-20, 27-

28.  By contrast, peer-reviewed evidence demonstrates that transgender people who have fully socially transitioned have rates of anxiety and depression that are no different from the general population.  Leibowitz Dec. ¶¶ 43-44.  Consequently, "[e]very professional major medical organization across all disciplines providing care to youth has come out against coercive laws and policies that dictate restroom use based on a person's physical anatomy."  Leibowitz Dec. ¶ 32.

Third, H.B. 2 causes harm by involuntarily outing people as transgender in their schools, workplaces, and communities by forcing them to either use bathroom and changing facilities obviously inconsistent with their gender identity and presentation, or to use single-user facilities specially designated for transgender people.  Fraser Dec. ¶ 32; Leibowitz Dec. ¶ 28.  Many transgender people undergo hormone therapy that dramatically changes their "appearance and physiology," giving them secondary sex characteristics consistent with their gender identity (i.e., body shape, body hair patterns, breasts, and the sound of their voice).  Brown Dec. ¶ 47; *see also* Leibowitz Dec. ¶¶ 21-22 (discussing pubertal suppression).  Thus, a transgender man or woman is often indistinguishable from any other man or woman but for their genitals or perhaps even just the label on a birth certificate.  For such people, entering bathroom or changing facilities inconsistent with their gender identity risks creating a situation that would be not only humiliating to the person and disruptive in exactly the ways H.B. 2's proponents profess to be concerned about, but also would expose that person to the high risk of bullying, harassment, "and other harmful attacks, including hate crimes that may result in death."  Brown Dec. ¶ 56; Leibowitz Dec. ¶ 28; Jaime M. Grant *et al.*, *Injustice At Every Turn:  A*

*Report of the National Transgender Discrimination Survey*, National Center for Transgender Equality and National Gay and Lesbian Task Force (NCTE Study), at 154 (2011) (noting that "outing" a person as transgender "presents the possibility for disrespect, harassment, discrimination or violence") (Ex. 21).

As a practical matter on a daily basis, H.B. 2 leaves transgender people with a series of untenable options when they require use of a public bathroom. First, they could use a bathroom inconsistent with their gender identity and presentation. As discussed above, however, whether because of psychological trauma or the risk of harassment, that is often no option at all. Alternatively, they could use a single-occupancy bathroom that has been specifically designated for transgender individuals to use, which, assuming one is available, still stigmatizes them as not "real" men or women, and may unwillingly out them as transgender. Or, they could violate state law and use facilities consistent with their gender identity, living in fear of either official or private enforcement of H.B. 2's prohibition on their presence.

Finally, transgender people could avoid using public bathrooms altogether. Many choose the latter course, risking discomfort at the very least, if not significant health consequences. Fraser Dec. ¶ 33 ("Denial of restroom use in accordance with gender identity causes the use of such facilities to become a source of anxiety for transgender individuals. For example, when faced with the possibility of being forced to use facilities based on the sex that they were assigned at birth, some of my clients have tried not to drink anything all day to avoid going to the bathroom and have developed medical complications, such as urinary tract infections, due to lack of voiding.").

Each of these options imposes burdens on transgender employees that other employees do not bear. Recognizing the potential adverse consequences of denying transgender people access to workplace bathrooms consistent with their gender identity, the Occupational Safety and Health Administration ("OSHA") has issued a guide to bathroom access for transgender workers, which advises that "all employees should be permitted to use the facilities that correspond with their gender identity" in order to avoid "the adverse health effects that can result if toilets are not available when employees need them." Memorandum to Regional Administrators and State Designees from John B. Miles, Jr., Director of Compliance Programs, Regarding OSHA's Interpretation of 29 C.F.R. 1910.141(c)(1)(i): Toilet Facilities (Apr. 6, 1998) (Ex. 22); *see* OSHA, *A Guide to Restroom Access for Transgender Workers*, at 2 (June 1, 2015) (OSHA Transgender Guidance) ("Bathroom restrictions can result in employees avoiding using restrooms entirely while at work, which can lead to potentially serious physical injury or illness.") (Ex. 26).[17]

_____

[17] That view is consistent with the bathroom access positions of the Department of Housing and Urban Development (HUD), and the Office of Personnel Management (OPM), which have concluded that, in a situation where a distinction based on sex is permissible under the law, a transgender person's "sex" must be determined by his or her gender identity, not by the sex assigned at birth. HUD, *Appropriate Placement for Transgender Persons in Single-Sex Emergency Shelters and Other Facilities* at 3 (Feb. 20, 2015) (Ex. 23); OPM, *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace* (Ex. 24); *see also* U.S. Dept. of Labor, Office of Job Corps, *Directive: Job Corps Program Instruction Notice No. 14-31* at 3-4 (stating that the overriding factor in assigning students to sex-specific facilities should be the student's gender identity); Equal Employment Opportunity Commission, Order 560.008 *Question and Answers* (June 22, 2016) at 5-6 (Ex. 25) (same, and explaining that bathrooms must be available consistent with gender identity).

No one would question that an employer's decision to exclude certain women from women's bathroom or changing facilities because they did not have long hair, or because they did not have breasts, or because their voices were too deep, would be an unlawfully discriminatory employment practice. *Cf. Price Waterhouse*, 490 U.S. at 242. H.B. 2's exclusion of transgender women from women's bathrooms and exclusion of transgender men from men's bathrooms because of the sex they were assigned at birth is no different. "Treatment of this kind by one's employer is most certainly adverse." *Lusardi,* 2015 WL 1607756 at *10.

Therefore, because it stigmatizes and disadvantages transgender employees relative to other employees, denying transgender employees access to workplace bathrooms and changing facilities consistent with their gender identity constitutes unlawful sex-based employment discrimination under Title VII.

    3. Defendants' Compliance With and Implementation of H.B. 2 Violates Title VII as a Pattern or Practice of Discrimination Against Their Own Employees and as a Pattern or Practice of Resistance to all Public Employees' Federal Employment Rights.

Because H.B. 2's exclusion of transgender people is an unlawful employment practice based on sex, Defendants are liable under Title VII in two separate and independent ways.

First, the State, UNC and DPS are liable for implementing a pattern or practice of discriminatory treatment of transgender employees. Discriminatory conduct rises to the level of a "pattern or practice" under Title VII if it is the employer's "standard operating procedure," as opposed to "the mere occurrence of isolated or 'accidental' or sporadic

discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). H.B. 2 easily satisfies those criteria because it applies statewide and thereby makes a facially discriminatory employment policy the "standard operating procedure" of North Carolina's public agencies and, in the process, harms large numbers of transgender North Carolinians. This broad mandate can hardly be dismissed as merely an "isolated," "accidental" or "sporadic" incident of employment discrimination. *Id.* Because this facially discriminatory policy treats transgender individuals adversely based on their sex, no further showing of animus or intent is required to prevail on the Title VII claim. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (holding that policies that treat employees "in a manner which but for that person's sex would be different" are facially discriminatory); *Bauer v. Lynch*, 812 F.3d 340, 347 (4th Cir. 2016), *pet. for cert. filed* (June 9, 2016) (holding that Title VII is violated where a greater burden is placed on the protected group).

Separately, the State and Governor are also liable under Title VII for executing H.B. 2's mandate of discrimination as to all public agency employers. Title VII applies not only to employers but also to "any person or group of persons," including "governments, governmental agencies, [and] political subdivisions," who resist the full enjoyment of Title VII rights. 42 U.S.C. § 2000e-6(a). The State and Governor are

34

engaging in a pattern or practice of resistance to the full enjoyment of equal employment under Title VII by enforcing H.B. 2's mandate on public agencies and requiring those employers under their authority to discriminate in violation of Title VII. *See United States v. Bd. of Educ.*, 911 F.2d 882, 892 & n.9 (3d Cir. 1990); N.C. Exec. Order 93 § 3 (Ex. 27).

### C. The United States is Likely to Succeed on its VAWA Claim.

VAWA provides that "[n]o person in the United States shall, on the basis of actual or perceived . . . sex, [or] gender identity (as defined in paragraph 249(c)(4) of title 18, United States Code) . . . , be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under [VAWA] . . . ." 42 U.S.C. 13925(b)(13)(A).

H.B. 2 requires public agencies receiving funds under VAWA—including UNC and DPS—to treat transgender people differently from non-transgender people. Whereas people who are not transgender may continue to use UNC and DPS bathrooms and changing facilities that correspond to their gender identity, H.B. 2 prohibits transgender people from doing so because their birth-assigned sex differs from their gender identity. This is, by definition, discrimination under VAWA.

Consequently, these Defendants' compliance with and implementation of H.B. 2 violates VAWA in multiple respects—as discrimination based on sex, including gender identity, and perceived sex. The term "sex" carries the same meaning in VAWA that it does in Title IX and Title VII. *See Schwenk*, 204 F.3d at 1202 (holding that both Title VII and a precursor statute to VAWA "prohibit discrimination based on gender as well as

35

sex.  Indeed, for purposes of these two acts, the terms 'sex' and 'gender' have become interchangeable.").  Thus, for the same reasons identified above, Defendants' compliance with and implementation of H.B. 2 discriminates because of sex, including gender identity, in violation of VAWA.[18]  Regardless of the meaning of sex under VAWA or any other statute, H.B. 2 is also discrimination on the basis of gender identity, in violation of the plain language of VAWA.  H.B. 2 further discriminates based on "perceived sex" because the basis for requiring transgender men to use women's bathroom and changing facilities and transgender women to use men's facilities turns on the fact that those who enacted and enforce that statute "perceive" transgender people's sex to be the opposite of what it is—that is, Defendants do not perceive transgender women to be women until and unless their birth certificate has been changed.  Because of the myriad harms transgender people experience as a result of this discriminatory treatment, *see* Part I.B.2., *supra*, H.B. 2 violates VAWA.

---

[18]  The express listing of "gender identity" in VAWA does not negate the argument that discrimination based on gender identity falls within the meaning of discrimination "based on . . . sex."  There is no evidence that Congress intended the inclusion of "gender identity" in VAWA to imply such a limitation on "sex," and Congress' inaction on including that explicit term in Title VII and Title IX does not support an inference regarding its intent with regard to the scope of those statutes.  *See also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."); *cf.* Brief of 128 Members of Congress as Amici Curiae Supporting Plaintiff-Appellant at 2, *Christiansen v. Omnicom Group, Inc.*, No. 16-cv-748 (2d Cir. June 28, 2016) (explaining that pending congressional legislation that would make "sexual orientation" and "gender identity" expressly covered by Title VII represents an effort to codify and clarify existing Title VII protections and does not undermine the conclusion that "Title VII's sex discrimination provision already prohibits discrimination based on an individual's sexual orientation and gender identity").

**D. Defendants' Purported Justifications for H.B. 2 Do Not Alter the United States' Strong Likelihood of Success on the Merits.**

Defendants have previewed several arguments why they claim H.B. 2 does not unlawfully discriminate against transgender people. None of these arguments has merit or justifies categorically excluding transgender people who have not obtained amended birth certificates from public bathroom and changing facilities consistent with their gender identity, let alone alters the conclusion that the United States is likely to succeed on the merits.

1.     Access to Single-Occupancy Facilities Does Not Negate H.B. 2's Discrimination.

Defendants claim H.B. 2 is not unlawful because the statute authorizes public agencies "to accommodate . . . [transgender] individuals." Doc. No. 32 at 14. The only "accommodation" authorized by H.B. 2 allows public agencies to create single-occupancy bathrooms and changing facilities for transgender people who are denied the right to use multiple-occupancy facilities. N.C. Session Law 2016-03, sec. 1.3 § 143-760(c).[19] Notably, this accommodation is purely discretionary. H.B. 2 does not require provision of single-occupancy facilities or require that any such facilities be equivalent to multiple-occupancy facilities. But, even if it did, providing access to a single-user facility would not erase the stigmatic or psychological harms caused by H.B. 2. *See*

---

[19] Specifically, this provision states that "Nothing in this section shall prohibit public agencies from providing accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances, but in no event shall that accommodation result in the public agency allowing a person to use a multiple occupancy bathroom or changing facility designated under subsection (b) of this section for a sex other than the person's biological sex." § 143-760(c).

*supra* Part I.B.2.  The harm of discrimination comes from the exclusion itself, from the stigma and shame of being labeled insufficiently female or male to "qualify" to use multiple-occupancy bathroom and changing facilities, not merely from the inability to access equivalent facilities.  *See id.*; *see also, e.g.,* Declaration of Paige Dula (June 30, 2016) (Ex. 32) (hereinafter "Dula Dec.") ¶ 7 ("Having to use a separate bathroom made me feel ostracized, isolated, and not part of the team.  I felt like an 'other.'"); Declaration of A.N. (July 1, 2016) (Ex. 41) (hereinafter "A.N. Dec.") ¶ 23 ("If I were required to use only gender-neutral facilities I would feel singled out. It would remind me of the 1960s when I grew up in Georgia and saw signs on doors and restaurants where blacks and Jews were not allowed.").

Moreover, as explained above, requiring that transgender people use special facilities risks outing transgender people to communities who may not be aware they are transgender, risking psychological harm and increased exposure to bullying, harassment, and violence. *See supra* Part I.B.2.  As federal agency guidelines suggest, agencies may offer transgender people the *option* of using single-occupancy facilities, just as they may offer that option to any person seeking greater privacy than can be found in a multiple-occupancy facility.  But they may not *mandate* that transgender people use single-occupancy facilities and thereby discriminatorily exclude transgender men from bathrooms and changing facilities available to other men and transgender women from facilities available to other women.  *See* Dear Colleague Letter, U.S. Departments of Justice and Education (May 13, 2016) (Ex. 14); Memorandum to Regional Administrators and State Designees from John B. Miles, Jr., Director of Compliance

38

Programs, Regarding OSHA's Interpretation of 29 C.F.R. 1910.141(c)(1)(i): Toilet Facilities (Apr. 6, 1998) (Ex. 22); OSHA, *A Guide to Restroom Access for Transgender Workers*, at 2 (June 1, 2015) (Ex. 26).

As the EEOC recognized in *Lusardi*, the denial of *equal access* is the discriminatory act, regardless whether the agency provides segregated alternatives for transgender employees. 2015 WL 1607756 at *9 ("Equal access to restrooms is a significant, basic condition of employment."). The same logic applies to VAWA and Title IX. Moreover, *Gloucester* forecloses this argument at least as to Title IX by affording controlling weight to the federal agency determination that recipients of federal funds that provide multiple-occupancy, sex-segregated facilities must open them to transgender people consistent with their gender identity. *Gloucester*, 2016 WL 1567467 at *6-7. Thus, under all three civil rights statutes, the provision of alternative bathroom and changing facilities cannot, as a matter of law, negate the illegality of denying transgender people access to multiple-occupancy facilities consistent with their gender identity when other men and women face no such denial.

Even if the availability of single-occupancy bathroom and changing facilities were a relevant factor in determining whether H.B. 2 constitutes discrimination, which it is not, the statute does not *require* public agencies to provide access to such facilities. Whether because of indifference because officials will not believe it worth the cost, some almost certainly will not. And the record before the Court demonstrates that transgender people cannot be expected to rely on access to such facilities to serve their needs. *See* A.N. Dec. ¶ 22 (testifying to a lack of gender-neutral options at the fire stations that serve the

39

witness's base for her work as an EMT); Declaration of D.B. (July 1, 2016) (hereinafter "D.B. Dec.") ¶ 18; Declaration of D.S.B. (June 30, 2016) (hereinafter "D.S.B. Dec.") ¶ 8 (noting that "one of my client[s] couldn't find a bathroom he felt safe using and urinated on himself in public because he couldn't hold it any longer."); Declaration of A.T. (July 2, 2016) (Ex. 40) (hereinafter "A.T. Dec.") ¶19 (describing an incident where he was intimidated to use the men's room, and there were "no conveniently located gender neutral restrooms nearby" so he used the women's room, which "triggered my dysphoria so badly that I will never do it again."); H.K. Dec. ¶ 13 (describing gender neutral bathroom in campus center as "locked" and "[i]n order to access it, one has to go to a guest services desk and ask for a key" which "'outs' me as transgender."); C.W. Dec. ¶¶ 17-18 (noting that "a majority of gender neutral bathrooms on campus are off the beaten path, tucked away in rarely used hallways or hidden behind offices, so I fear being attacked in these remote locations" and noting that he primarily uses "the restroom in my dorm suite" or "the restroom in my friends' dorm suites" but that the "dorms are not convenient to where my classes are located and can take 20 to 40 minutes roundtrip depending on pedestrian traffic and where I am located on campus.").

For all of these reasons, H.B. 2's accommodation to permit public agencies to provide transgender people access to single-user facilities does not diminish the United States' likelihood of success on the merits.

2. Permitting Transgender People Who Have Obtained Amended Birth Certificates to Access Facilities Consistent with Gender Identity Does Not Negate H.B. 2's Discrimination.

Defendants further claim that H.B. 2 does not discriminate because transgender people may use bathrooms and changing facilities consistent with their gender identity if they have "a sex change operation" and "make a corresponding change to their birth certificate." Doc. 8-1 ¶ 3, 37.[20] However, the possibility of having surgery and changing one's birth certificate does not remedy H.B. 2's discrimination, for several reasons.

First, medical professionals agree that using bathroom and changing facilities consistent with gender identity is a prerequisite to surgery, not the other way around. Transgender people must live as their gender identity—including by accessing bathroom and changing facilities consistent with their gender identity—for at least 12 continuous months before a medical professional will authorize surgery. Brown Dec. ¶ 46, 52; *see also* Leibowitz Dec. ¶ 23. Thus, H.B. 2 requires transgender people to endure

---

[20] At least 21 states, including North Carolina, statutorily require transgender people to undergo surgery in order to change their birth certificates, and others may require it as a matter of practice. Alabama: Ala. Code § 22-9A-19(d) (2016); Arizona: Ariz. Rev. Stat. Ann. § 36-337(a)(3) (2016); Arkansas: Ark. Code Ann. § 20-18-307(d) (West 2016); Colorado: Colo. Rev. Stat. Ann. § 25-2-115(4) (West 2016); Georgia: Ga. Code Ann. § 31-10-23(e) (2015); Illinois: 410 Ill. Comp. Stat. 535/17(1)(d) (2016); Iowa: Iowa Code Ann. § 144.23(3) (West 2016); Kentucky: Ky. Rev. Stat. Ann. § 213.121(5) (West 2016); Louisiana: La. Stat. Ann. § 40:62 (2016); Michigan: Mich. Comp. Laws Ann. § 333.2831(c) (West 2016); Mississippi: Miss. Code Ann. §41-57-21 (2016); Missouri: Mo. Rev. Stat. § 193.215(9) (2016); Montana: Mont. Admin. R. 37.8.311(5) (2016); Nebraska: Neb. Rev. Stat. Ann. § 71-604.01 (West 2016); Nevada: Nev. Admin. Code § 440.130 (2015); New Hampshire: N.H. Rev. Stat. Ann. 5-C:87(V) (2016); New Jersey: N.J. Stat. Ann. § 26:8-40.12 (West 2016); New Mexico: N.M. Stat. Ann. § 24-14-25(D) (West 2016); North Carolina: N.C. Gen. Stat. Ann. § 130A-118(b)(4) (West 2016); Virginia: Va. Code Ann. § 32.1-269(E) (West 2015), *amended by* 2016 Virginia Laws Ch. 496 (S.B. 592) (2016); Wisconsin: Wis. Stat. Ann. § 69.15(4) (West 2016), *amended by* 2015-2016 Wisc. Legis. Serv. Act 380 (2015 A.B. 41) (West 2016).

discrimination for at least 12 months before they could even be eligible for surgery. They must also be in a stable psychological state, with symptoms of gender dysphoria largely under control. Brown Dec. ¶ 46, 52. As such, the trauma and interruption of treatment for gender dysphoria caused by H.B. 2 may prevent transgender people from ever meeting the "readiness criteria" for surgery.

Second, for many transgender people, other treatments for the distress of gender dysphoria—such as social role transition or hormone therapy—are sufficient, rendering surgery unnecessary. Brown Dec. ¶¶ 49, 55. Forcing transgender people to undergo unnecessary major surgery as a condition of obtaining access to facilities consistent with their gender identity is, itself, discriminatory.

Third, surgery is simply out of reach for many transgender people. For some, specific medical conditions may foreclose the option. Brown Dec. ¶ 50. Surgery is also not available for people under the age of majority. Brown Dec. ¶ 52; Leibowitz Dec. ¶ 22. And for many more, the high cost and lack of health insurance coverage make surgery unobtainable. Brown Dec. ¶ 51. Others may simply choose not to have surgery, a decision that the law should not unnecessarily force upon them. Transgender men are men and transgender women are women, "irrespective of whether they have had surgical interventions to change their bodies." Brown Dec. ¶ 32. For all these reasons, the vast majority of transgender people do not have surgery, and thus H.B. 2 still discriminates against the vast majority of transgender people. Brown Dec. ¶ 49.

Fourth, amended birth certificates are not available as a matter of law to many transgender people, even if they have obtained surgery. At least four states do not permit

changes to birth certificates under any circumstance—meaning that transgender residents or visitors to North Carolina born in those states face discrimination in the form of an absolute prohibition on access to bathrooms and changing facilities consistent with their gender identity.[21]

Finally, the law still treats transgender people adversely by erecting inappropriate and burdensome obstacles to their equal access that are not imposed on non-transgender people. Non-transgender people are not required to show their birth certificate before using a public facility. They are not required to engage in a bureaucratic process to obtain documentation of their sex. *See* D.B. Dec. ¶ 9 (discussing the expense and obscure burdens of obtaining an out-of-state birth certificate amendment); Declaration of Alaina Kupec (July 1, 2016) (Ex. 34) (hereinafter "Kupec Dec.") ¶ 7 (same). Thus, H.B. 2 still stigmatizes, singles out, and burdens transgender people. *See* Dula Dec. ¶¶ 9-10 ("Even though H.B. 2 does not prohibit me from using the women's bathroom because I have changed by birth certificate, I am scared that someone will harass me for being in the women's bathroom if they think I am transgender. . . . I have begun planning my day to make sure I use the restroom at work or at home where I feel safe and avoid using any public restrooms."); Kupec Dec. ¶ 7 ("I felt humiliated to have to change my birth certificate . . . . I would be horrified if I had to disclose that I am transgender in order to use a women's bathroom.").

---

[21] *See* Tenn. Code Ann. § 68-3-203(d) (2006); *In re Ladrach*, 32 Ohio Misc. 2d 6, 513 N.E.2d 828 (Ohio Prob. Ct. 1987); *In re Estate of Gardiner*, 273 Kan. 191 (2002); IDAHO CODE ANN. § 39-250 (West 2005); IDAHO ADMIN. CODE r. 16.02.08.201 (2015). Thus, even under the view that sex discrimination only covers discrimination based on anatomical differences, H.B. 2 discriminates against transgender people born in these states who have had genital surgery.

For all these reasons, notwithstanding H.B. 2's clause permitting people who have obtained amended birth certificates to access bathrooms and changing facilities consistent with their gender identity, the statute still discriminates against transgender people.

        3.       <u>Privacy and Public Safety Concerns Do Not Justify H.B. 2's Discrimination</u>.

Defendants also suggest a range of privacy and public safety rationales, bereft of any evidence, for denying transgender people access to facilities consistent with their gender identity. *See, e.g.,* Doc. 32 at 14; Doc. 8-1 ¶ 5.

As an initial matter, the Fourth Circuit rejected these arguments in *Gloucester.* In its grant of deference to the federal agency's interpretation of Title IX's regulations, the Fourth Circuit dismissed the defendant's vague purported safety concerns, as well as the district court's (and dissent's) weighing of privacy and safety concerns, finding those interests a matter of policy committed to the agency, not the courts. *Gloucester*, 2016 WL 1567467 at *8. Specifically, the Fourth Circuit stated, "[w]e are unconvinced of the existence of danger caused by 'sexual responses prompted by students' exposure to the private body parts of students of the other biological sex.' The same safety concern would seem to require segregated restrooms for gay boys and girls . . . in sex-segregated restrooms." *Id.* at n.11.

Even if such concerns could justify this discriminatory policy, the particular concerns raised in this case are wholly unsupported and fall far short of justifying a categorical exclusion of transgender people from sex-segregated bathrooms and changing

44

facilities consistent with their gender identity. Notably, eighteen states[22] and as many as 225 cities and counties[23] currently have protections in place that ensure the right of transgender employees to use sex-segregated facilities consistent with their gender identity, and seventeen states[24] and more than 200 cities and counties[25] prohibit discrimination in public accommodations based on gender identity. Many of those places have had such protections in place for over a decade. Numerous school districts

---

[22] CAL. GOV. CODE § 12940 (West 2016); COLO. REV. STAT. ANN. § 24-34-402 (West 2012); COLO. REV. STAT. ANN. § 24-34-301(7) (West 2014); CONN. GEN. STAT. ANN. § 46a-60 (West 2011); DEL. CODE ANN. tit. 19, § 711 (West 2015); D.C. CODE ANN. § 2-1402.11 (West 2016); HAW. REV. STAT. ANN. § 378-2 (West 2016); 775 ILL. COMP. STAT. ANN. 5/1-102 (West 2015); 775 ILL. COMP. STAT. ANN. 5/1-103(O-1) (West 2015); IOWA CODE ANN. § 216.6 (West 2009); ME. REV. STAT. ANN. TIT. 5, § 4572 (2016); ME. REV. STAT. ANN. TIT. 5, § 4553(9-C) (2012); MD. CODE ANN., State Government, § 20-606 (West 2014); MASS. GEN. LAWS ANN. ch. 151B, § 4 (West 2015); MINN. STAT. ANN. § 363A.08 (West 2014); MINN. STAT. ANN. § 363A.03 (Subd. 44) (West 2016); NEV. REV. STAT. ANN. § 613.330 (West 2015); N.J. STAT. ANN. § 10:5-12 (West 2014); N.M. STAT. ANN. § 28-1-7 (West 2008); OR. REV. STAT. ANN. § 659A.030 (West 2016); OR. REV. STAT. ANN. § 174.100(7) (West 2016); 28 R.I. GEN. LAWS § 28-5-7 (West 2016); UTAH CODE ANN. § 34A-5-106 (West 2016); VT. STAT. ANN. tit. 21 § 495 (West 2016); WASH. REV. CODE ANN. § 49.60.180 (West 2007); WASH. REV. CODE ANN § 49.60.040(26) (West 2009).

[23] See Human Rights Campaign, *Cities and Counties with Non-Discrimination Ordinances that Include Gender Identity* (Ex. 28).

[24] CAL. ANN. CODE § 51 (West 2016); COLO. REV. STAT. ANN. § 24-34-601 (West 2014); COLO. REV. STAT. ANN. § 24-34-301(7) (West 2014); CONN. GEN. STAT. ANN. § 46a-64 (West 2012); DEL. CODE ANN. tit. 6, § 4504 (West 2013); D.C. CODE ANN. § 2-1402.31 (West 2016); HAW. REV. STATE. ANN. § 489-3 (West 2016); 775 ILL. COMP. STAT. ANN. 5/5-102 (West 2007); 775 ILL. COMP. STAT. ANN. 5/1-103(O-1) (West 2015); IOWA CODE ANN. § 216.7 (West 2007); ME. REV. STAT. ANN. tit. 5, § 4591 (2016); ME. REV. STAT. ANN. tit. 5, § 4553(9-C) (2012); MD. CODE ANN., State Government, § 20-304 (West 2014); MINN. STAT. ANN. § 363A.11 (West 2014); N.J. STAT. ANN. § 10:5-12 (West 2014); N.M. STAT. ANN. § 28-1-7 (West 2008); OR. REV. STAT. ANN. § 659A.403 (West 2016); OR. REV. STAT. ANN. § 174.100(7) (West 2016); 11 R.I. GEN. LAWS § 11-24-2 (West 2016); VT. STAT. ANN. tit. 9 § 4502 (West 2016); WASH. REV. CODE ANN. § 49.60.010 (West 2007); WASH. REV. CODE ANN § 49.60.040(26) (West 2009).

[25] See National Center for Transgender Equality, *Know Your Rights: Public Accommodations* (Ex. 29).

45

around the country have well-established practices of permitting transgender students to use facilities consistent with their gender identity.[26] And the vast majority of jurisdictions have no particular policy or practice, but allow social convention to dictate bathroom usage. In those places—and, indeed, in North Carolina until the passage of H.B. 2—it is almost certainly the case that transgender people every day use bathrooms and changing facilities consistent with their gender identity. Despite having this history to draw on, Defendants can point to no valid evidence of an epidemic of public safety issues or complaints about invasion of privacy resulting from allowing transgender people to use facilities consistent with their gender identity.[27]

To the contrary, people with actual experience negotiating the rights of transgender people and the interests of people expressing discomfort about their presence have testified to a range of options available to accommodate and alleviate privacy and safety concerns that do not place the burden of accommodation on transgender people. Janice Adams, an educator and administrator with more than forty years of experience working in schools as teacher, principal, and superintendent, stated that she has known of at least seven transgender students spanning elementary, middle, and high school during her tenure, and that she was always able to address privacy complaints with "a few key

---

[26] *See* United States Department of Education, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016) (Ex. 30).

[27] On May 8, 2016, Governor McCrory was asked on Fox News Sunday whether, to his knowledge, any person in the last one year or five years had ever been a case of a person "using transgender protections to commit crimes in bathrooms?" He replied "not that I'm aware of" and disavowed having used that argument to justify H.B. 2. Fox News Sunday, NC Gov. McCrory says he'll answer Justice ultimatum on transgender bathroom issue by Monday deadline, http://www.foxnews.com/politics/2016/05/08/nc-gov-mccrory-says-hell-answer-justice-ultimatum-on-transgender-bathroom-issue-by-monday-deadline.html (May 8, 2016) (Ex. 31).

steps" including open communication and making available "increased privacy options for all students." Declaration of Janice Adams (June 27, 2016) (Ex. 38) (hereinafter "Adams Dec.") ¶¶ 13-15. Those steps involved "minimal time and expense." *Id.* ¶ 15. After taking those steps, privacy concerns subsided and transgender students were accepted without further incident. *Id.* ¶¶ 11, 16, 19-20.

Helen Carroll, a former athletic director and head women's basketball coach at UNC-Asheville, co-authored the 2011 NCAA Guide for Transgender Athlete Inclusion and has worked with at least fourteen colleges and high schools to develop transgender-inclusive policies. She stated "that transgender student athletes should be able to use the locker room, shower and toilet facilities in accordance with the student's gender identity" and that athletic programs may make available, but should not require the use of, separate facilities. Declaration of Helen Carroll (June 24, 2016) (Ex. 42) (hereinafter "Carroll Dec.") ¶ 15. Although her responsibilities as a coach and athletic director "included ensuring my athlete's privacy and safety," she noted that excluding transgender athletes from locker rooms consistent with gender identity was bad for team cohesion and perpetuates "misconceptions and misinformation in policies that create problems rather than solve them." *Id.* ¶¶ 4-5, 21.

Moreover, drawing on their extensive experience treating transgender people, medical experts have noted that transgender people in sex-segregated spaces generally take pains to conceal any sex-related characteristic that marks them as not belonging; one of the core attributes of being transgender is a desire to be perceived consistent with their gender identity. Fraser Dec. ¶ 30 ("When transgender people use sex-segregated

47

facilities consistent with their gender identity, their goal is to stay invisible, and to avoid doing anything that would suggest that they do not belong in that space."); ¶ 31 ("Of the thousands of clients with whom I have worked, I have never encountered anyone who wanted to expose their physical differences to others."); Kupec Dec. ¶ 10 ("I have used the women's locker rooms and I never had an issue or problem doing so. . . . The last thing that I wanted to do was to draw any attention to myself."); Adams Dec. ¶ 18 ("In my experience, transgender students do not want to be noticed. They do not want to call attention to themselves. They just want to be left alone to be kids like their peers. They just want to fit in.").

Several transgender witnesses testified that, before enactment of H.B. 2 and in private spaces where its exclusion does not apply, they never encountered objections or concerns when they have used facilities consistent with their gender identity. *See* D.B. Dec. ¶ 11; Kupec Dec. ¶¶ 6, 8; A.N. Dec. ¶¶ 12-13, 15. To the contrary, safety concerns and complaints from others when these witnesses used bathrooms consistent with their sex assigned at birth were part of what drove many of them to fully transition to living consistent with their gender identity. D.B. Dec. ¶ 12; A.N. Dec. ¶ 13.

As this evidence demonstrates, H.B. 2 exacerbates rather than addresses privacy concerns by mandating that people who identify, present, and act like men—because they *are* men—nevertheless use women's bathrooms and changing facilities if their birth certificates do not match their gender identity. *See* Fraser Dec. ¶ 37 ("[A] transgender man forced to use the women's room will be acutely aware that the women in that space may see him as threatening their physical safety because they do not understand why he

48

is using the women's restroom."); D.B. Dec. ¶ 15 ("I am also concerned that I would frighten women and girls in a women's bathroom because they would likely be confused and concerned if they saw me enter a women's bathroom because I look like a man."). The reality of who transgender people are reveals the illogic of forcing them into bathrooms and changing facilities inconsistent with their gender identity in the name of privacy and safety.

Additionally, there is no basis for concluding that transgender people's use of bathrooms or changing facilities corresponding to their gender identity poses a safety risk to any other person. Any suggestion that H.B. 2 is necessary to prevent male sexual predators from *posing* as transgender in order to lawfully enter women's bathrooms to assault them is baseless. This behavior is illegal regardless of the existence or non-existence of H.B. 2,[28] and there is no evidence that North Carolina—or any other of the 17 states or 200 cities and counties that have allowed transgender women to use bathroom and changing facilities that correspond with their gender identity—have either confronted a public safety problem as a result, or been unable to successfully prosecute crimes involving male sexual predators as a result of their non-discrimination laws or policies. There is no evidence to suggest that H.B. 2 would be more effective than existing laws at deterring wrongdoers from criminal behavior. Indeed, the only

---

[28] *See, e.g.*, N.C.G.S.A. § 14-27.21; N.C.G.S.A. § 14-27.22; N.C.G.S.A. § 14-27.26; N.C.G.S.A. § 14-27.27; N.C.G.S.A. § 14-27.33. Courts have applied these criminal prohibitions to convict assailants who used deception to gain access to their vulnerable victims. *See, e.g.*, *State v. Miles*, 764 S.E. 2d 237, 241 (2014); *State v. Wilson*, 250 S.E. 2d 621, 628 (1979).

demonstrable effect H.B. 2 has on public safety is that it puts transgender people at greater risk of harassment and physical violence. *See* Part I.B.2, *supra*.

Once tested, Defendants' purported concerns for public safety and bodily privacy can be reduced to an interest in accommodating objections to the presence of transgender people in certain public spaces. But objections to sharing bathrooms and changing facilities with transgender people cannot, as a matter of law, be a basis for discrimination under Title IX, Title VII or VAWA. Sex discrimination cannot be justified by a "desire to accommodate other people's prejudices or discomfort." *Macy*, 2012 WL 1435995, at *10 and n.15; *Lusardi*, EEOC Decision No. 0120133395 at 10 ("Allowing the preferences of [others] to determine whether sex discrimination is valid reinforces the very stereotypes and prejudices" the law prohibits); *see also* "Directive: Job Corps Program Instruction Notice No. 14-31," Dept. of Labor Job Corps at 4 ("[M]ost courts have concluded that an entity's desire to cater to the perceived biases of its customers, employees, or other third parties is not a defense for unlawful discrimination. The same principle applies to discrimination against transgender persons."); *cf. Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudices but neither can it tolerate it. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("[M]ere negative attitudes, or fear . . . are not permissible bases for" government action).

Courts consistently have rejected legal claims by individuals who have objected to sharing facilities with a transgender person, belying any argument that some

countervailing civil right trumps the right of transgender people to be free from discrimination. *See, e.g.*, *Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 983-984 (8th Cir. 2002) (rejecting argument that being required to share facilities with a transgender coworker constituted an "adverse employment action" under Title VII); *Crosby v. Reynolds*, 763 F. Supp. 666, 670 (D. Me. 1991) (rejecting claim that placing a transgender person in a jail cell with someone who was not transgender violated clearly established right to privacy); *see also Dept. of Fair Employment and Housing v. American Pac. Corp.*, 34-2013-00151153-CU-CR-CDS, at *1 (Cal. Super. Ct. Mar. 13, 2014) ("Defendant's hypothetical assertions of emotional discomfort about sharing facilities with transgender individuals are no different than similar claims of discomfort in the presence of a minority group, which formed the basis for decades of racial segregation in housing, education, and access to public facilities like restrooms, locker rooms, swimming pools, eating facilities, and drinking fountains."). Thus, accommodating other peoples' objections to the presence of transgender people cannot, as a matter of law, justify a policy that singles out and burdens transgender people on the basis of sex.

Public agencies certainly can take measures to enhance privacy for people who feel the need for it, whether or not they are transgender. They may also take necessary steps to respond to a specific, concrete security concern. What they cannot do in the name of privacy or security is bar an entire class of individuals from using bathrooms and changing facilities that correspond to their gender identity.

51

## II.    H.B. 2 Irreparably Harms Transgender People and the Interests of the United States.

This Court need not engage in a factual inquiry as to irreparable harm; rather, the United States is entitled to a presumption of irreparable harm when it seeks to enjoin the violation of a federal civil rights statute.  As a preliminary matter, it is well-established that violations of federal civil rights statutes constitute irreparable harm as a matter of law.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("where a defendant has violated a civil rights statute," "irreparable injury [may be presumed] from the fact of the defendant's violation"); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993); *Rogers v. Windmill Pointe Village Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992) (quoting *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984)) (the showing of irreparable injury to support an injunction "may be presumed from the fact of discrimination"); *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) (same); *Pathways Psychosocial Support Ctr., Inc. v. Town of Leonardtown*, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (presuming irreparable harm from violation of civil rights statute); *Doe v. Wood Cnty. Bd. of Educ.*, 888 F. Supp. 2d 771, 773 (S.D. W.Va. 2012) (granting preliminary injunction and holding that "a violation of Title IX may constitute irreparable harm") (*citing McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 301-02 n. 25 (2d Cir. 2004)).

More specifically, the government need not establish irreparable injury when it seeks a preliminary injunction pursuant to an affirmative statutory grant of authority to seek injunctive relief to enjoin the violation of a statutory right.  *See, e.g., United States v.*

*Central Carolina Bank & Trust Co.*, 431 F.2d 972, 975 (4th Cir. 1970) (holding that the United States need not demonstrate injury to a private person to be entitled to preliminary injunctive relief under the Civil Rights Act of 1964); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (same); *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) (same). Rather, the "usual prerequisite of irreparable injury need not be established and the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction." *Hayes*, 415 F.2d at 1045. Instead, "irreparable injury should be presumed from the very fact that the statute has been violated." *Id.*; *see also Central Carolina*, 431 F.2d at 975 n.7 (explaining that the statutory authorization for the government to seek "preliminary relief without the intervention of an individual aggrieved party implies that the forbidden discrimination itself constitutes irreparable injury"). Therefore, upon a determination that the United States is likely to succeed on the merits of its civil rights claims, the Court may find irreparable harm without any further factual inquiry.

In any event, even without applying such a presumption, the United States has demonstrated irreparable harm because H.B. 2 is causing significant psychological, stigmatic, economic, social, and physical harm to transgender people.

First, testimony from transgender employees and students in North Carolina make clear that the stigma of separating transgender people from other men and women and subjecting them to disfavored status, as discussed in Part I.B.2, *supra*, is adversely affecting transgender people. *See* Dula Dec. ¶ 7 ("Having to use a separate bathroom made me feel ostracized, isolated, and not part of the team. I felt like an 'other.'");

Kupec Dec. ¶ 9 ("H.B. 2 is degrading and dehumanizing since all I want is to live as the woman that I know I am."); AT Dec. ¶¶ 22-23 ("The fact that my university is covered by H.B. 2 is hurtful to me. It feels like a punch in the face from the State I love."); D.S.B. Dec. ¶ 15 ("My clients have expressed that they feel alienated, not protected, that they are not part of society.").

Second, H.B. 2's interference with transgender people's ability to live consistent with their gender identity, including disrupting treatment for gender dysphoria, is also causing actual and ongoing psychological distress. Individual witnesses have testified that, prior to H.B. 2, their use of gender-appropriate facilities was a critical part of their mental health and well-being. Kupec Dec. ¶ 6 ("Once I started living full-time as a woman and using the women's bathrooms, I felt complete and that finally all the parts of me matched. After a life of hiding myself, this was an indescribably wonderful feeling."); A.N. Dec. ¶ 17 ("After my full-time transition and before H.B. 2 my world was perfect because I was finally able to live true to myself after many years of turmoil.").

Since H.B. 2, by contrast, these witnesses have suffered anguish and a diminished sense of self. D.B. Dec. ¶ 14-15 ("I am not comfortable in a women's bathroom because I am not a woman."); Kupec Dec. ¶ 11 ("It is degrading and emotionally crippling to even think about" using a men's locker room); Dula Dec. ¶ 9 ("[S]ince H.B.2 was enacted, my anxiety and insomnia have returned. I am now intending to start using Xanax again because of my anxiety which I have not had to take in years."); A.N. Dec. ¶ 25 (H.B. 2 "gives me a big ball of stress and anxiety that is difficult to describe."); A.T. Dec. ¶¶ 21-

22 ("If I were able to consistently and safely use the men's restroom and men's locker room I would feel less depressed and experience less dysphoria . . . H.B. 2 often makes me feel anxious and scared"); H.K. Dec. ¶ 20 ("I have gender dysphoria. It has worsened since H.B. 2 passed. I have trouble sleeping and regularly feel anxious and afraid."); C.W. Dec. ¶ 22, 27 ("Using anything besides the men's room is invalidating to me. I want to use the men's room because that is how I see myself. . . . H.B. 2 makes me feel anxious and scared every day."); A.T. Dec. ¶¶ 22 ("Because of H.B. 2, I think that it would be easier for me to live as a woman. But I can't go back to living as a woman. If I had to do that, I would probably commit suicide.").

Third, transgender people are living in fear of being outed as transgender by being forced to use bathrooms inconsistent with their gender identity and presentation, or by being relegated to alternative single-user bathrooms or changing facilities other people are not required to use. D.B. Dec. ¶ 16 ("I find it an invasion of privacy to have to explain that I am transgender simply because I want to use the bathroom."); H.K. Dec. ¶ 13 (discussing fear of being outed by having to ask special permission for access to the only viable single-user bathroom in a UNC student union). Such people also live in concrete, heightened fear of harassment and violence. *See* D.S.B. Dec. ¶ 7, 13, 15 ("My clients are terrified of using any public bathroom . . . for fear of harassment and danger. Several of my clients will no longer leave their homes to go out at night because they are too afraid of being attacked. They are literally terrified. . . . They are also concerned about their family's safety."); D.B. Dec. ¶ 14 ("I am nervous to use the women's bathroom because I look like and present as a man. . . . I believe that my physical safety

55

could be at risk if I were to use a women's bathroom."); Dula Dec. ¶¶ 11-13 (describing incidents of being harassed for using bathrooms while transgender); A.N. Dec. ¶ 13 (describing harassment prior to transitioning to using facilities consistent with gender identity and noting that "H.B. 2 puts me in danger because it requires me to go into a men's bathroom even though I am a woman and look like a woman. I am also scared that if I were to use the men's room I could be assaulted or even raped"); A.T. Dec. ¶ 10, 12, 15 ("Every time I use the restroom on campus I am worried people might follow me in and attack me physically, based in part on what I have read and heard about attacks on transgender people. . . . Sometimes when I don't know who might be in a restroom and I feel unsafe or uncomfortable, I ask masculine-looking male friends to come into the restroom with me. I didn't do that prior to H.B. 2. . . . I am afraid that if I am physically attacked in a restroom, I might be the one who gets in trouble because I am violating H.B. 2."); H.K. Dec. ¶ 12, 20 ("I also don't feel safe in men's restrooms, but I was afraid that someone would try to haul me out if I used a women's restroom because of H.B. 2. . . . H.B. 2 has enabled and encouraged people to openly make transphobic and threatening statements and harass transgender people. It makes me feel terrified that I will be attacked."); C.W. Dec. ¶ 17-18, 20, 22 (noting that people have questioned his use of the women's room since H.B. 2 and stating "I do not feel safe using the gender neutral bathrooms on campus . . . Using them outs me as transgender and makes me a target. . . . As a general rule, I don't feel safe using any bathrooms anymore.").

These fears are not baseless. One witness described an incident post-H.B. 2's enactment in which a transgender man attempted to use a men's bathroom he had been

using consistently for the past six months without problems. He was grabbed by the shoulders by another man and physically forced out of the bathroom. "Shaken and scared, he then attempted to use a female public restroom in another location. He was then told he was in the wrong bathroom." D.S.B. Dec. ¶ 7, 14. Two student witnesses described specific incidents of harassment that have occurred since H.B. 2. Student A.T. testified that he "was using a men's restroom on campus and I felt very scared because a number of men were in the restroom and stared through the restroom stall door at me. I waited in the stall for over 30 minutes for the men to leave because I was so afraid." A.T. Dec. ¶ 13. A.T. "did not report this incident to my university because, despite my extreme fear, I didn't think the university would take action because the men didn't physically attack me." *Id.* at ¶ 14. Student C.W. described an incident in early April 2016, a few weeks after H.B. 2 was enacted, wherein he "was confronted by two men in the men's room in Elliott Center, the main student union on campus." C.W. Dec. ¶ 12. According to C.W.:

> I entered the bathroom and passed two men at the sink washing their hands on my way to the stall. One of the men turned around and stared at me as I entered the stall. After I entered the stall, among other things, I heard the men say: "It's unbelievable," "I can't believe this," "Tranny," "Dyke!"

*Id.* at ¶ 13. This incident "triggered a panic attack and I froze . . . I was afraid they might come back or that they were waiting for me outside the door. After I was calm enough to think, I decided that because no one had come back, and about 20-30 minutes had passed, the men had probably left the building." *Id.* Immediately after and since this incident, C.W. experienced increased anxiety and depression, began more frequently using anti-

anxiety medication, and attempted to seek additional mental health counseling. *Id.* at ¶¶ 14-16. He has "not used the men's room on campus since this incident occurred." *Id.* at ¶ 17. C.W. did not report this incident because "the whole thing was traumatizing, I was scared, and I didn't think the University would take any action as a result." *Id.* at ¶ 19. According to C.W., "[h]ad my school made clearer statements about protecting students in bathrooms after H.B. 2, I absolutely would have reported the April 10 incident." *Id.* at ¶ 24.

Whether by stigmatizing, traumatizing, or involuntarily outing transgender people, H.B. 2 is inflicting concrete and tangible harm. The statute's discriminatory message puts all transgender people, especially children, at higher risk of mental health problems, including suicide. Leibowitz Dec. ¶¶ 20-31 (discussing how laws like H.B. 2 "promotes rejection of transgender identities, including by parents of transgender youth" who face "much higher risk for suicidal behavior when compared to youth who are not transgender" especially when they do not experience familial support); Fraser Dec. ¶ 37 (describing how laws like H.B. 2 can cause "a resurgence of internalized transphobia, anxiety, depression, anger, stigma, and dissociation" and noting that 41% of transgender individuals have attempted suicide); Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, J. of Homosexuality Feb. 25, 2016, at 19 ("Findings indicate relationships between denial of access to bathrooms and gender-appropriate campus housing and increased risk for suicidality.").

H.B. 2's exclusion also impedes educational, employment, and other socio-economic opportunities for transgender people. Leibowitz Dec. ¶ 27 (reporting that

58

transgender youth who are unable to use "restroom or other facilities consistent with their gender identity" "are unable to access opportunities traditionally associated with growing up and maturing into an adult, such as getting a job or exploring educational enrichment opportunities. The loss of these activities during an important developmental stage of youth can have long term consequences on individuals' financial and employment prospects later in life, which can lead to depression and anxiety."); Fraser Dec. ¶ 34 (noting that "the fear and anxiety such policies inspire can result in transgender people removing themselves from work-related or social interactions. Having to forego these important professional and personal opportunities due to fear that an attempt to use the restroom at such an event could result in being outed, harassed, or worse is not only harmful in the moment, but can also have lasting psychological, social and economic effects (*e.g.*, loss of self-confidence, isolation, professional stagnation)."); D.B. Dec. ¶ 19 (testifying that he is considering leaving his job because of H.B. 2, which could "negatively affect my life and career"); A.N. Dec. ¶ 24 ("I worry that, if the state forced my county to comply with H.B. 2 . . . I would no longer be able to work in EMS in North Carolina."); D.S.B. Dec. ¶ 5 (averring that a transgender person enrolled in a full-time degree program on a UNC campus withdrew to attend community college from home so that he could better control his access to non-public bathrooms). H.B. 2 also is impacting the ability of transgender people to engage in opportunities for civic participation. D.S.B. Dec. ¶ 6 (reporting that a transgender North Carolinian was shut out of jury duty).

Finally, H.B. 2 is causing serious discomfort and risking medical complications for the many transgender North Carolinians who are responding to the law by avoiding

bathroom usage.  *See* D.S.B. Dec. ¶ 12 ("[T]he vast majority of my clients stopped using public restrooms unless they can find family restrooms or a handicap restroom.  They also avoid going to state facilities because they don't want there to be an issue."); H.K. Dec. ¶ 10 ("After H.B. 2 became law, I started exclusively using gender neutral restrooms on campus when I could find one.  When I couldn't find one or one was not nearby, I would 'hold it' until I could find a gender neutral restroom.  Sometimes I had to 'hold it' for up to two hours, which was very uncomfortable and distressing."); C.W. Dec. ¶ 21 ("I have learned I have to either live with the physically uncomfortable and distracting process of 'holding it' or I have to track my bathroom habits closely.  I try to limit my water intake and keep track of the last time I drank by carrying a water bottle and monitoring how much the level in the bottle decreases over a certain period of time so I can plan my bathroom visits.  This process is mentally tolling, demoralizing, and distracting.").  In short, H.B. 2 often functions as an effective denial of access to a bathroom altogether.

For all of these reasons, even without the presumption of irreparable harm to which the United States is entitled when a federal civil rights statute is violated, the Court should find that H.B. 2 creates a significant probability of serious, irreparable harm.

### III.   The Balance of Equities Weighs Heavily in Favor of an Injunction to Halt Implementation of H.B. 2.

In considering preliminary injunctive relief, the court is required to "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).   The balance of equities weighs clearly in favor of granting the

injunction. The stigmatic, psychological, and physical harms that H.B. 2's implementation causes transgender people have been set forth in detail already, as has the United States' strong interests in enforcement of its civil rights laws. Those equities significantly outweigh the relatively negligible burdens of halting the implementation of H.B. 2 and reverting to the facility access policies of the status quo prior to H.B. 2's enactment just over three months ago.

Prior to H.B. 2's enactment on March 23, 2016, there were no statewide statutory restrictions on transgender individuals' use of bathrooms and other facilities in North Carolina. "The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that the court can render a meaningful decision after a trial on the merits." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991). Notably, "[t]he status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions . . . such an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (internal citations omitted). In this case, "the last uncontested status between the parties which preceded the controversy" was prior to H.B. 2's enactment. Returning to that status quo would not be any more burdensome for the Defendants today than it was prior to March 23, 2016, following a practice regarding the use of sex-segregated

public facilities that, as the Court itself has observed, has "been followed for a millennia" in North Carolina. Doc. 54 (June 22, 2016, Hearing Tr. 8:1-8).

Granting a preliminary injunction will not harm the Defendants in any significant way, as there is no financial or other real cost in granting the relief. Indeed, prior to the passage of H.B. 2, Defendants had not cited any harms, financial or otherwise, associated with permitting transgender people access to bathrooms and changing facilities consistent with their gender identity. As the Court observed during a June 22, 2016, telephonic conference, proponents and enactors of H.B. 2 appear to have been motivated by a desire to preempt a local ordinance, which is not in effect and would not be in effect should the Court grant the requested preliminary injunction. Doc. 54 (June 22, 2016, Hearing Tr. 7:22-8:6). UNC has repeatedly (if inconsistently) disavowed a desire to enforce H.B. 2, strongly suggesting the absence of negative consequences to that Defendant from a preliminary injunction. And as noted above, numerous jurisdictions around the country continue to allow transgender people to use public facilities corresponding to their gender identity, belying any argument that serious negative consequences would flow from an injunction. *See supra* Part I.D. Moreover, as the Fourth Circuit has noted, "precedent counsels that a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found" unlawful. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (internal quotation omitted).

**IV.    An Injunction to Halt Implementation of H.B. 2 Would Serve the Public Interest.**

For similar reasons, issuing an injunction halting compliance with and implementation of H.B. 2 is in the public interest because it prevents ongoing harm to transgender people and it effectuates the purposes of federal civil rights statutes.  The harms that H.B. 2's implementation causes transgender people have been set forth previously.  *See supra* Parts I.B.2 and III.  Granting the injunctive relief that the United States seeks would serve the public interest in the enforcement of federal anti-discrimination laws.  *See Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 326 (1980) (noting that when the government uses its enforcement power under Title VII "it acts also to vindicate the public interest in preventing employment discrimination"); *Cohen v. Brown Univ.*, 991 F. 2d 888, 906 (1st Cir. 1993) (recognizing that "the overriding public interest [lies] in the firm enforcement of Title IX"); *Doe v. Wood County Bd. Of Educ.*, 888 F. Supp. 3d 771, 778 (S.D. W. Va. 2012) ("The public interest is certainly served by promoting compliance with Title IX").

**V.    The United States' Claims Against UNC are Justiciable.**

Finally, rather than dispute H.B. 2's violation of federal law, UNC has argued that the United States' claims against it are not "justiciable" because "the Act . . . is silent about enforcement, and the UNC Defendants consequently neither enforce nor threaten to enforce it."  Doc. 46 at 4.  This argument fails for several reasons.

First, H.B. 2 is not "silent about enforcement."  It is a self-executing directive from the State to its constituent public agencies.  It states that public agencies, including

UNC, "*shall require* multiple occupancy bathrooms or changing facilities . . . be designated for and *only used by* individuals based on their biological sex" and requires public agencies to deny transgender people access to facilities consistent with their gender identity. N.C. Session Law 2016-03, sec. 1.3 § 143-760(b) (emphasis added). The State of North Carolina and the Governor have represented to this Court that UNC "is bound by the provisions of H.B. 2" and "cannot unilaterally avoid enforcing or complying with H.B. 2." Doc. 54 (Tr. 12:3-10). Therefore, notwithstanding any statements from UNC officials to the contrary, H.B. 2 applies on UNC's seventeen campuses in violation of federal law. UNC cannot both comply with H.B. 2 and federal law at the same time.

Second, any statements by UNC that it will not effectuate or enforce H.B. 2 on its campuses are legally insufficient to render this action non-justiciable. Even assuming the University has the authority to follow through on such statements—authority that the State and Governor insist UNC lacks—the Fourth Circuit has held that a defendant's "promise" that it would interpret a statute as not enforceable against a plaintiff's activity did not render a controversy non-justiciable because it was "no guarantee that the [defendant] might not tomorrow bring its interpretation more in line with the provision's plain language." *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999). UNC has indicated that it will not enforce H.B. 2's provisions on bathrooms and changing facilities because UNC does not interpret the statute to require enforcement of that provision. Such an interpretation cannot be reconciled with the statute's mandatory terms, and UNC could change this interpretation at any time absent an order from this

64

Court.  *Id.* at 711 (noting that a "litigation position that [defendant] will voluntarily refrain from enforcing the statute according to its plain language" is not a valid defense).

The cases UNC has cited in its filings in the related case *Carçano v. McCrory*, 1:16-cv-00236, do not suggest otherwise.[29]  Unlike a criminal or civil regulatory statute directed at private behavior, H.B.2's enforcement does not depend upon the prosecutorial discretion of law enforcement or regulatory agencies.  To the contrary, it is a self-executing directive from the North Carolina government to a subsidiary institution.  Thus, UNC's reliance on cases holding that a plaintiff must establish a specific threat of enforcement to establish a live case or controversy is entirely misplaced.

Third, notwithstanding UNC's pronouncements, it has in fact taken action to enforce H.B. 2.  Specifically, UNC has informed students and other persons on campus that its bathroom and changing facilities are covered by H.B. 2 and has affirmed that the campus is required to comply with the statute's mandates.  As noted above, UNC's President issued a memorandum widely distributed on campus directing that, in compliance with H.B. 2, "University institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex."  Memorandum from Margaret Spellings to Chancellors 1 (Apr. 5, 2016) (Ex. 2).  That memorandum further directs University institutions to "[p]rovide

---

[29] *See Carçano v. McCrory*, 1:16-cv-00236, Doc. 50 (June 9, 2016). Several of the cases UNC cites in that filing also address the question of a private plaintiff's standing to challenge a statute regulating private behavior, which is irrelevant to the United States' standing to challenge a policy that is currently in effect and in direct conflict with federal law. *See* Doc. 46.  While Article III standing requirements do apply to the United States, the law is clear that a showing of specific individual injury is not required in enforcement actions brought by the United States. *United States v. Central Carolina Bank & Trust Co.*, 431 F.2d 972, 975 (4th Cir. 1970).

notice of the Act to campus constituencies" and to "fully meet their obligations under the Act." *Id*. at 1-2 (Ex. 2). It takes the position that "the University is required to fulfill its obligations under the law unless and until the court directs otherwise." *Id.* at 2; *see also* Letter from Margaret Spellings, President, Univ. of N.C., to Shaheena Ahmad Simons, Acting Chief, U.S. Dep't of Justice, Civil Rights Div., Educ. Opportunities Section 3 (Apr. 13, 2016) (Ex. 3) (further affirming that the University us "required . . . to comply" with H.B. 2 and declaring that, in UNC's view, H.B. 2 is "presumptively valid and constitutional"). UNC has also admitted that it "provided information about the location of single-occupancy bathrooms" to people on campus, information that in the context of H.B. 2's recent passage and UNC's statements of the law's applicability would reasonably be interpreted as an instruction to use those facilities and not multiple-occupancy facilities, as H.B. 2 commands. Doc. 46 at 11.

These actions create an objective expectation of compliance with H.B. 2 on UNC campuses. Upon learning that the University is "specifically covered by H.B. 2" and that compliance is "required," transgender people on UNC's campus would reasonably understand the University to have instructed them not to use campus facilities consistent with their gender identity. Likewise, other persons may reasonably interpret UNC's message to mean they should personally challenge, oppose, or report individuals whom they believe are attempting to use a facility inconsistent with UNC's policy and H.B. 2. Any action or statement by UNC suggesting otherwise indicates, at most, mixed messages and obfuscation, not the absence of a justiciable controversy.

66

Unsurprisingly, testimony from individual students, UNC employees, and others who attend events on campus suggests precisely this result—people are confused, and remain genuinely fearful of enforcement on UNC's campuses. D.B. Dec. ¶ 17; Kupec Dec. ¶¶ 12-13; A.T. Dec. ¶ 16; H.K. Dec. ¶ 17; C.W. Dec. ¶ 23. Students who choose to use facilities consistent with their gender identity do so at their own peril—knowing they are in violation of state law and risk having a classmate or colleague report them to a University official, campus police, or local law enforcement. A.T. Dec. ¶ 16 ("My university has not put guards in front of restrooms to enforce H.B. 2, but I do not know what the university would do if someone reported me for violating H.B. 2 on campus. If that were to happen, I am worried I might be charged with trespassing, which could result in a criminal record that would hurt my future employment and graduate school prospects."); H.K. Dec. ¶ 12 ("I was afraid that someone would try to haul me out if I used a women's restroom because of H.B. 2.").

Under these circumstances, the United States' claims against UNC based on the application of H.B. 2 on campus are ripe and justiciable.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction prohibiting Defendants from complying with or implementing Part 1.3 of North Carolina Section Law 2016-03, House Bill 2.

This the 5th day of July, 2016.

Respectfully submitted,

RIPLEY RAND
United States Attorney
Middle District of North Carolina
United States Department of Justice
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
Telephone: (336) 333-5351
E-mail: ripley.rand@usdoj.gov

VANITA GUPTA
Principal Deputy Assistant Attorney
General

SHAHEENA SIMONS
Chief, Educational Opportunities Section

DELORA L. KENNEBREW
Chief, Employment Section

COREY L. STOUGHTON
Senior Counsel

LORI B. KISCH
WHITNEY PELLEGRINO
Special Litigation Counsel

DWAYNE J. BENSING
TOREY B. CUMMINGS
SEAN R. KEVENEY
ALYSSA C. LAREAU
CANDYCE PHOENIX
TARYN WILGUS NULL
Trial Attorneys
United States Department of Justice
Civil Rights Division

/s/ *Torey B. Cummings*
MA Bar Number: 664549
Senior Trial Attorney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
torey.cummings@usdoj.gov

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-CV-00425 |
| | ) | |
| STATE OF NORTH CAROLINA; | ) | |
| PATRICK MCCRORY, in his official | ) | |
| capacity as Governor of North Carolina; | ) | |
| NORTH CAROLINA DEPARTMENT OF | ) | |
| PUBLIC SAFETY; UNIVERSITYOF | ) | |
| NORTH CAROLINA; and BOARD OF | ) | |
| GOVERNORS OF THE UNIVERSITY OF | ) | |
| NORTH CAROLINA, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using CM/ECF to the following:  Karl S. Bowers, Jr., Robert C. Stephens, William Woodley Stewart, Jr., Brennan Tyler Brooks, Frank J. Gordon, Robert N. Driscoll, Amar Majmundar, Olga E. Vysotskaya De Brito, Carolyn C. Pratt, Glen D. Nager, James M. Burnham, Noel J. Francisco, Stuart K. Duncan, Gene C. Shaerr, Robert D. Potter, Jr., David A. Cortman, James A. Campbell, Jeremy D. Tedesco, Jonathan Caleb Dalton; and mailed to the following non-CM/ECF participant:

Steven-Glenn: Johnson
c/o 208 Nydegg Road
New Bern, NC 28562

Respectfully submitted,


/s/ *Torey B. Cummings*
MA Bar Number: 664549
Senior Trial Attorney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-4092
Email: Torey.Cummings@usdoj.gov

*Counsel for Plaintiff*