**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         *Plaintiff*,<br><br>v.<br><br>STATE OF NORTH CAROLINA, *et al.*,<br><br>         *Defendants*. | Case No. 1:16-cv-00425 |

## BRIEF IN SUPPORT OF UNC DEFENDANTS' MOTION TO DISMISS

The University of North Carolina is "a public, multicampus university dedicated to the service of North Carolina and its people." N.C. Gen. Stat. § 116-1. Its mission is straightforward yet vital: to educate its students. The University, however, now finds itself caught in a conflict between state law (which calls for separating bathrooms on the basis of biological sex) and federal guidance (which calls for separating bathrooms on the basis of gender identity). Forcing the University to participate in this highly charged political controversy distracts it from its educational mission.

Here, there is no basis for drawing the University into this dispute. Neither the University nor its Board of Governors (collectively UNC Defendants) played any role in enacting the Act, and neither has enforced or threatened to enforce its provisions. Indeed, the University's President has declared that the Act has no enforcement provisions and that she has no intent to take any action to enforce it. The United States has nevertheless sued the UNC Defendants, seeking a declaration that the Act is unenforceable and an

injunction prohibiting them from enforcing it. Multiple obstacles prevent the United States from prevailing against the UNC Defendants and require dismissal of these claims.

*First*, the claims against the UNC Defendants are neither justiciable under the Constitution nor ripe for consideration under prudential doctrines limiting judicial review, because the UNC Defendants neither enforce nor threaten to enforce the Act. *Second*, the United States may not maintain a Title IX claim against the UNC Defendants, because the United States does not have a statutory cause of action to bring such a claim. *Finally*, the United States cannot obtain a permanent injunction against the UNC Defendants, because a declaratory judgment alone would afford it an adequate remedy.

For these reasons, the Court should dismiss all of the United States' claims under Civil Rule 12(b)(1), and dismiss the United States' Title IX claim and request for a permanent injunction under Civil Rule 12(b)(6).

## NATURE OF THE MATTER

This lawsuit is about the validity of the Public Facilities Privacy and Security Act.

## STATEMENT OF FACTS

**1.** The University of North Carolina comprises sixteen constituent institutions of higher education and one constituent high school. N.C. Gen. Stat. § 116-4. The University's Board of Governors is responsible for "the general determination, control, supervision, management and governance of all affairs" of the University. *Id.* § 116-11(2). The University's President, Margaret Spellings, executes the University's policies subject to the Board's direction and control. Spellings Decl. ¶ 2, ECF No. 46-1. These

2

policies include a prohibition on "unlawful discrimination against any person on the basis of . . . sex, sexual orientation, [or] gender identity." *The Code of the Board of Governors of the University of North Carolina* § 103 (2001), ECF No. 46-3.

**2.** On March 23, 2016, the North Carolina General Assembly enacted the Public Facilities Privacy and Security Act. The Act states that public agencies, including the University, "shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex" as "stated on [the] person's birth certificate." N.C. Gen. Stat. § 143-760(a)–(b). The Act allows public agencies to "provid[e] accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances." *Id.* § 143-760(c). The Act contains no enforcement provisions and establishes no civil or criminal penalties.

**3.** The University has repeatedly made plain that the Act gives it no enforcement authority and that it consequently has no plans to enforce the Act. Specifically:

**a.** On April 5, President Spellings sent a memorandum about the Act to chancellors of the University's constituent institutions. Guidance Mem., ECF No. 46-5. The Guidance Memorandum, which "responds to requests for guidance . . . concerning the Act's requirements," consists of a series of frequently asked questions followed by President Spellings' answers. *Id.* at 1.

The Guidance Memorandum addresses the question: "What are the University's obligations under the Act relating to bathrooms and changing facilities?" *Id.* The memorandum answers: "University institutions must require every multiple-occupancy

bathroom and changing facility to be designated for and used only by persons based on their biological sex." *Id.* The memorandum later states that, "[l]ike all public agencies, the University is required to fulfill its obligations under the law unless or until [a] court directs otherwise." *Id.* at 2.

The Guidance Memorandum then explains that University institutions "fully meet their obligations under the Act" by taking three steps: (1) "[d]esignat[ing] and label[ing] multiple-occupancy bathrooms and changing facilities for single-sex use with signage," (2) "[p]rovid[ing] notice of the Act to campus constituencies as appropriate," and (3) "[c]onsider[ing] assembling and making information available about the locations of designated single-occupancy bathrooms and changing facilities on campus." *Id.* at 1–2. It adds that University institutions "already designate and label multiple-occupancy bathrooms and changing facilities for single-sex use with signage" and thus need only "maintain these [existing] designations and signage." *Id.* at 2.

Finally, the Guidance Memorandum emphasizes that "[t]he Act does not contain provisions concerning enforcement." *Id.* It adds that "[t]he Act does not require University institutions to change their nondiscrimination policies," that "those policies should remain in effect," and that "constituent institutions must continue to operate in accordance with [those] policies and must take prompt and appropriate action to prevent and address any instances of harassment and discrimination." *Id.* at 1–2.

**b.** About one week later, President Spellings issued a supplement to the Guidance Memorandum. Spellings April 11 Statement, ECF No. 46-8. She reiterated that the

4

memorandum "simply states what the General Assembly and Governor passed into law," that campuses already label bathrooms for men and women, and that "the law does not address enforcement and confers no authority for the University . . . to undertake enforcement actions." *Id.* She also reemphasized that the University maintains its "commitment to diversity [and] inclusion," "will not change existing non-discrimination policies," and "will not tolerate any sort of harassing or discriminatory behavior on the basis of gender identity or sexual orientation." *Id.*

**c.** Finally, President Spellings has submitted a sworn declaration confirming that the University "has not threatened to enforce the Act's requirement that the University require individuals to use the restroom or changing facility that corresponds with their biological sex." Spellings Decl. ¶ 13. She further swore that she had "no intent to exercise [her] authority to promulgate any guidelines or regulations that require that transgender students use the restrooms consistent with their biological sex." *Id.* ¶ 16. She also swore that, "[i]f any transgender student or employee does complain that they have been forced to use a restroom inconsistent with their gender identity, [she] will ensure that the complaint is investigated to determine whether there has been a violation of the University nondiscrimination policy and applicable law." *Id.* ¶ 15.

**4.** Despite these clear, repeated statements of non-enforcement by the UNC Defendants, the United States filed a complaint asserting that they are violating (1) Title VII of the Civil Rights Act of 1964 (Title VII), (2) Title IX of the Education

Amendments of 1972 (Title IX), and (3) the Violence Against Women Reauthorization Act of 2013 (VAWA). Compl. ¶¶ 54–56.

## QUESTIONS PRESENTED

1. Whether the United States' claims against the UNC Defendants violate constitutional and prudential restrictions on this Court's jurisdiction.

2. Whether the United States fails to state a claim under Title IX because it lacks a cause of action to sue under that statute.

3. Whether the United States fails to state a claim for a permanent injunction because a declaratory judgment would constitute an adequate remedy.

## STANDARD OF REVIEW

Civil Rule 12(b)(1) allows a defendant to move for dismissal for "lack of subject-matter jurisdiction." When ruling on a Rule 12(b)(1) motion, the district court may "consider exhibits outside the pleadings" and "weigh the evidence [to] satisfy itself as to the existence of its power to hear the case." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). The plaintiff "bears the burden of persuasion." *Id.*

Civil Rule 12(b)(6) allows a defendant to move for dismissal for "failure to state a claim upon which relief can be granted." When ruling on a Rule 12(b)(6) motion, the district court should "accept as true all well-pled facts in the complaint." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2013). The court may, "without converting the motion to dismiss into one for summary judgment," consider extrinsic documents "quoted by, relied upon, incorporated by reference [by] or otherwise integral

6

to the complaint." *Plymouth County Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 536–37 (M.D.N.C. 2013) (Schroeder, J.).

## ARGUMENT

### I. THE COURT SHOULD DISMISS THE CLAIMS AGAINST THE UNC DEFENDANTS UNDER RULE 12(B)(1)

Federal courts have jurisdiction only to resolve live cases and controversies, not to adjudicate abstract debates. But there is no live controversy here between the United States and the UNC Defendants: As President Spellings' Declaration confirms, the UNC Defendants have neither enforced nor threatened to enforce the Act, and thus have not inflicted on *anyone*, much less on the United States, the sort of injury that is a prerequisite to suing in federal court. In accordance with Civil Rule 12(b)(1), the Court should dismiss all claims against the UNC Defendants. *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir. 2003) (lack of justiciability is grounds for dismissal under Rule 12(b)(1)); *ProEnglish v. Bush*, 70 Fed. Appx. 84, 86–88 (4th Cir. 2003) (lack of ripeness is grounds for dismissal under Rule 12(b)(1)).

#### A. The Lawsuit Against The UNC Defendants Is Not A Justiciable Case Or Controversy Under Article III

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," including those "Controversies to which the United States shall be a party." U.S. Const. art. III, § 2, cl. 1. It is "abundantly clear" that a challenge to the validity of a statute presents a justiciable case or controversy only if the defendant enforces or threatens to enforce the statute. *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir.

7

1986).  The UNC Defendants have neither enforced nor threatened to enforce the Act.  In fact, the only steps the UNC Defendants have taken in response to the Act comport with the United States' understanding of Title VII, Title IX, and VAWA.  That point alone defeats the United States' claims against the UNC Defendants.

### 1. A challenge to a statute is justiciable only if the defendant enforces or threatens to enforce that statute

The "mere existence" of a statute does not make a challenge to that statute "an adversary case" under Article III.  *Poe v. Ullman*, 367 U.S. 497, 507 (1961) (plurality opinion); *see Doe*, 782 F.2d. at 1207.  To the contrary, a challenge to a statute qualifies as a proper case or controversy only if the defendant enforces the statute, or there exists a "credible threat" that the defendant will enforce the statute.  *Susan B. Anthony List v. Driehaus* (*SBA List*), 134 S. Ct. 2334, 2342 (2014); *see Doe*, 782 F.2d at 1206.

This credible-threat requirement flows from the doctrine of Article III standing.  A plaintiff—including the United States—has standing to maintain a lawsuit in federal court only if (1) it has suffered an "injury in fact"—*i.e.*, an "invasion" of a judicially cognizable interest that is "concrete and particularized" and "actual or imminent," (2) the injury is "fairly traceable to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision."  *United States v. Windsor*, 133 S. Ct. 2675, 2686 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (alterations and internal quotation marks omitted).  A challenged statute can cause "actual or imminent" injury only if the defendant is enforcing it, or if there is a "credible threat" that the defendant will enforce it.  *SBA List*, 134 S. Ct. at 2341–42.

8

The credible-threat requirement also exists in ripeness doctrine. Article III prohibits federal courts from adjudicating "abstract disagreements" that have not ripened into "concrete case[s] or controvers[ies]." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 579–80 (1985). A disagreement about a statute's validity does not become "a ripe controversy" until there is a "live dispute involving the actual or threatened application" of the challenged law. *Renne v. Geary*, 501 U.S. 312, 320–21 (1991).

The Supreme Court and courts in this Circuit have applied the credible-threat requirement in a wide range of cases. For example, the Supreme Court dismissed a constitutional challenge to a law regulating railroad operations because "Plaintiffs did not allege that [the state Attorney General] threatened or intended to do anything for the enforcement of the statute." *Ex parte La Prade*, 289 U.S. 444, 458 (1933). The Court also dismissed a constitutional challenge to a law regulating contraception because "years of [state] history" revealed a "tacit agreement" not to enforce the law. *Poe*, 367 U.S. at 508. Similarly, the Fourth Circuit held that an unmarried couple could not challenge a state law prohibiting "fornication and cohabitation" because "[r]ecorded cases" and "recent arrest records" revealed that the challengers "face[d] only the most theoretical threat of prosecution." *Doe*, 782 F.2d at 1206. And a district court in this state dismissed a challenge to an ordinance regulating speeches on public streets because the plaintiff "made no allegation . . . that anyone threatened to apply the law to him." *Moore v. Asheville*, 290 F. Supp. 2d 664, 671 (W.D.N.C. 2003).

9

As these cases make clear, the credible-threat requirement protects vitally important interests. It "maintains proper separation of powers" by ensuring that federal courts do not "come to operate as second vetoes, through whom laws must pass for approval before they could be enforced." *Doe*, 782 F.2d at 1205–06. It safeguards "the integrity of the judicial process" (*Poe*, 367 U.S. at 505) by "provid[ing] courts with arguments sharpened by the adversarial process" and "narrow[ing] the scope of judicial scrutiny to specific facts" (*Doe*, 782 F.2d at 1205). And it "protects federalism by allowing the states to control the application of their own" statutes. *Id.*

### 2. The UNC Defendants have shown that they do not enforce or threaten to enforce the Act

A plaintiff challenging a statute, as "[t]he party invoking federal jurisdiction," "bears the burden of establishing" that the defendant enforces or threatens to enforce that statute. *SBA List*, 134 S. Ct. at 2342. The defendant, however, may negate the existence of a case or controversy by disclaiming any intention to enforce the law. For example, there was no case or controversy in *CIO v. McAdory*, 325 U.S. 472, 475 (1945), precisely because state officials had "agreed not to enforce" the challenged provision.

Here, the United States cannot carry its burden of demonstrating a justiciable controversy in light of the University's repeated (and uncontested) disclaimers of any authority or intention to enforce the Act—and, indeed, of any authority or intention to take any action that the United States seeks to prohibit:

- "The Act does not contain provisions concerning enforcement of the bathroom and changing facility requirements." Guidance Mem. 4.

10

- "We caution that the law does not address enforcement and confers no authority for the University or any other public agency to undertake enforcement actions."  Spellings April 11 Statement.

- "The law does not address enforcement and confers no authority for the University . . . to undertake enforcement actions. . . . The University has no process or means to enforce [the Act's] provisions."  Shanahan April 13 Letter to Dept. of Justice, ECF No. 46-9.

- "Throughout all of this time, the University has recognized that the Act does not address enforcement and therefore has not taken any steps to enforce the statute's requirements on its campuses."  Spellings May 9 Letter to Dept. of Justice, ECF No. 46-10.

- "The University has not threatened to enforce the Act's requirement that the University require individuals to use the restroom or changing facility that corresponds with their biological sex, as listed on their birth certificate.  In fact, I have repeatedly cautioned the constituent institutions that the Act confers no enforcement authority on the University or any other entity."  Spellings Decl. ¶ 13.

- "If any transgender student or employee does complain that they have been forced to use a restroom inconsistent with their gender identity, I will ensure that the complaint is investigated to determine whether there has been a violation of the University nondiscrimination policy and applicable law."  *Id.* ¶ 15.

- "Pending a final judgment in this case, I have no intent to exercise my authority to promulgate any guidelines or regulations that require that transgender students use the restrooms consistent with their biological sex."  *Id.* ¶ 16.

In light of these assurances, there is no live controversy between the United States and the UNC Defendants to adjudicate.

### 3. The United States cannot show that the UNC Defendants enforce or threaten to enforce the Act

Even putting aside the University's assurances that it will not take enforcement action, the United States still cannot show a justiciable controversy. To establish such a controversy, a plaintiff must show that the defendant threatens to inflict a "specific . . . objective harm" upon one who violates the challenged statute. *Doe*, 782 F.2d at 1206. The "mere existence of the [challenged] statute" does not suffice. *Id.* Likewise, a "subjective fear" of harm also does not suffice, because justiciability requires an "objective threat" of enforcement rather than a "subjective chill." *Id.* "Even past threats of prosecution may not be sufficient." *Id.*

Here, the United States has not even alleged—let alone proved—that the UNC Defendants enforce or threaten to enforce the Act. The complaint does not identify a single incident in which the UNC Defendants responded to a transgender person's use of a bathroom consistent with his or her gender identity by removing the person from the bathroom, by taking disciplinary action, by filing a police report, by seeking civil or criminal punishment, or by imposing *any* other concrete harm. Indeed, the complaint never even explains what, exactly, the UNC Defendants are doing that the United States wants them to stop doing. Because the United States fails even to *allege* a credible threat that the UNC Defendants will inflict a "specific objective harm" upon transgender people who use bathrooms consistent with their gender identity, the lawsuit against these defendants is not justiciable.

12

**B. The Lawsuit Against The UNC Defendants Is Not Ripe**

The United States' claims against the UNC Defendants also are not "ripe for judicial review." *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003). To determine whether a case is prudentially ripe, "courts must balance 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002). The plaintiff bears "[t]he burden of proving ripeness." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

The United States cannot establish the fitness for judicial review of its claims against the UNC Defendants. A claim is unfit for judicial review if it is "prematur[e] and abstrac[t]" (*Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972)), and a challenge to a state law is "premature" and "abstract" when there is no imminent threat of enforcement (*Doe*, 782 F.2d at 1207–08). For example, a challenge to an administrative policy concerning dental practices was unfit for review where the state dental board did "not plan to take any action" on the basis of the policy. *Int'l Acad. of Oral Med. & Toxicology v. N.C. State Bd. of Dental Exam'rs*, 451 F. Supp. 2d 746, 751 (E.D.N.C. 2006). So too, here, where the UNC Defendants do not plan to take any enforcement action on the basis of the Act.

Nor would denying review cause hardship. Hardship "is measured by the immediacy of the threat . . . of enforcement." *Miller*, 462 F.3d at 319. Here, of course, there is *no* threat of enforcement, much less an *immediate* one.

13

Since the United States cannot show fitness for review or hardship in the absence of review, the Court should dismiss its claims against the UNC Defendants as prudentially unripe.

## II. THE COURT SHOULD DISMISS THE TITLE IX CLAIM AND PRAYER FOR INJUNCTIVE RELIEF UNDER RULE 12(B)(6)

### A. The United States Lacks A Cause Of Action To Enforce Title IX

The United States ordinarily may bring a lawsuit to enforce a federal statute only if it has "specific statutory authorization" to do so—*i.e.*, only if the statute grants it a cause of action. *United States v. Solomon*, 563 F.2d 1121, 1127 (4th Cir. 1977). Title IX, however, does not grant the United States such a cause of action.

Title IX prohibits discrimination on the basis of sex "under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). It empowers agencies to make rules to "effectuate" this prohibition and states that agencies may obtain "compliance" (1) by "termination" of funding or (2) "by any other means authorized by law." *Id.* § 1682. It does not, however, say that the United States may secure compliance by bringing civil actions in federal court. That silence means that the United States does *not* have statutory authority to bring this lawsuit.

Nor do federal lawsuits to enforce Title IX qualify as "other means authorized by law." It is "axiomatic" that courts "will not recognize" a "right of action" under a federal statute unless Congress has created one "unambiguously" and "with a clear voice." *Clear Sky Wash LLC v. Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014); *see also Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). This exacting standard applies to "rights of

14

action in favor of the government" as well as rights of action in favor of "private litigants." *United States v. Philadelphia*, 644 F.2d 187, 191 (3d Cir. 1980). That is so because federal enforcement lawsuits "without specific statutory authorization" would disturb "'the equilibrium established by our constitutional system'" between executive and legislative authority. *Solomon*, 563 F.2d at 1129. In addition, when such lawsuits are aimed at state institutions, they raise serious problems of "federalism and comity." *Id.*

Section 1682—which empowers federal agencies to secure compliance by either cutting off funds or "by any other means authorized by law"—does not speak with the clarity needed to grant the United States a cause of action. Read naturally, the phrase "other means authorized by law" merely permits agencies to invoke methods of enforcement that are *already* "authorized" by some *other* "law." For example, "applicable proceeding[s] under State or local law" (28 C.F.R. §§ 54.605, 42.108(a)(2)) qualify as "other means authorized by law," because such proceedings are independently "authorized" by state and local law. The United States cannot point to any "law" that "authorize[s]" a federal cause of action for it to enforce Title IX. Such a cause of action is simply not a "means authorized by law."

Context confirms that the phrase "other means authorized by law" does not itself create a judicial cause of action. A phrase draws meaning "from the context in which it is used" (*Deal v. United States*, 508 U.S. 129, 132 (1993)), and "other means authorized by law" is used in the context of a provision that deals throughout with *administrative* rather than *judicial* enforcement: Section 1682 bears the caption "Federal administrative

15

enforcement . . ." It empowers "[e]ach federal department and agency" to issue "rules, regulations, [and] orders" to effectuate Title IX. It provides that enforcement action may not be taken until "the department or agency concerned has determined that compliance cannot be secured by voluntary means." It adds that an agency may terminate federal funds only after "an express finding on the [administrative] record, after opportunity for a hearing." And, verifying that § 1682 ("Federal administrative enforcement . . .") addresses only administrative enforcement, § 1683 ("Judicial review") addresses "judicial review" of "[a]ny department or agency action taken pursuant to section 1682." There is thus no basis for finding a cause of action buried in § 1682, as it focuses on administrative enforcement, while an entirely separate section of the statute addresses judicial proceedings.

Interpreting § 1682 not to create a cause of action also respects differences between Title IX and other, related statutes. When Congress excludes language in one statute that it includes in related statutes, courts presume that "Congress acts intentionally . . . in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Many civil-rights statutes include language authorizing federal enforcement actions. *See, e.g.*, 42 U.S.C. § 2000e-6 (Title VII) ("Attorney General may bring a civil action"); *id.* § 3614 (Fair Housing Act) ("Attorney General may commence a civil action"); *id.* § 12188(b)(1)(B) (Americans with Disabilities Act) ("Attorney General may commence a civil action"). The absence of a

comparably specific authorization in Title IX confirms that Title IX does not authorize federal enforcement lawsuits.

It is true, but beside the point, that federal regulations say that the Department of Justice may bring "[a]ppropriate proceedings" to enforce Title IX. 28 C.F.R. §§ 54.605, 42.108(a)(1). A regulation may "*invoke*" a right of action that "Congress through statutory text created," but "it may not *create* a right that Congress has not." *Sandoval*, 532 U.S. at 291 (emphases added). Congress has not created a cause of action here. It is likewise true, but again beside the point, that "[a] number of courts" have "held or indicated" that the United States may bring civil lawsuits to enforce funding recipients' "contractual assurances" that they will not engage in discrimination. *United States v. Marion County Sch. Dist.*, 625 F.2d 607, 613 n. 4 (5th Cir. 1980). These cases are irrelevant because the United States' complaint does not assert a claim for breach of a contractual assurance of nondiscrimination; it asserts only a claim for violation of the statute. Compl. ¶ 55.

The Court should therefore dismiss the Title IX claim.

## B. A Declaratory Judgment Would Be An Adequate Remedy

The United States also has no entitlement to a permanent injunction against the UNC Defendants, because a declaratory judgment would constitute an adequate remedy for any violation of federal law. In accordance with Rule 12(b)(6), the Court should dismiss the prayer for a permanent injunction. *See Foster v. Wells Fargo Bank, N.A.*, No.

17

14-17, 2014 WL 3965059, at *7 (W.D. Va. Aug. 13, 2014) (adequacy of other remedies is grounds for dismissal of a request for an injunction under Rule 12(b)(6)).

A permanent injunction is "a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If a less drastic remedy" (such as a declaratory judgment) "suffic[es] to redress [the plaintiff's] injury, no recourse to the additional an extraordinary relief of an injunction [is] warranted." *Id.* at 165; *see Nat'l Audobon Soc'y v. Dept. of Navy*, 422 F.3d 174, 200 (4th Cir. 2005).

In cases against government actors, courts begin with the presumption that the government "will abide by" a declaratory judgment (*Utah v. Evans*, 536 U.S. 452, 460 (2002)), leaving the plaintiff with "the burden of showing that [the government's] bad faith or other circumstances requir[e] the issuance of an injunction" (*R.I. Comm. on Energy v. GSA*, 561 F.2d 397, 405 (1st Cir. 1977)). For example, in *Douglas v. Jeannette*, 319 U.S. 157, 165 (1943), an injunction against a city's enforcement of a solicitation ordinance was neither "necessary [n]or appropriate," because there was "no allegation . . . and no proof" that the officials "would not . . . acquiesce" in a declaration of unconstitutionality. *See also Poe v. Gerstein*, 417 U.S. 281, 281 (1974) (*per curiam*) ("prope[r]" to "refus[e] to issue [an] injunction" in light of the presumption "that the State would respect the declaratory judgment"); *R.I. Comm.*, 561 F.2d at 405 (proper to "refus[e] to issue an injunction" where there is no "showing [of] bad faith"). Courts have applied these principles even at the pleadings stage. *See, e.g.*, *Bryant v. Blanton*, 463 F. Supp. 155, 157 (W.D. Tenn. 1979) (rejecting prayer for injunctive relief at the pleadings

18

stage because "[i]t is presumed that defendants intend to and will abide by [a] declaratory judgment").

Here, the Court must presume that the University and Board—both government actors—will give full credence to any declaratory judgment that the Court issues. The Guidance Memorandum—which the complaint quotes (Compl. ¶ 20) and which the Court may therefore consider on a motion to dismiss (*Plymouth County Ret. Ass'n*, 966 F. Supp. 2d at 536–37)—expressly reinforces this presumption. It makes clear that the University will "fulfill its obligations under the [Act] *unless or until the court directs otherwise*." Guidance Mem. at 2 (emphasis added).

The complaint does not include any allegations that the University or Board would disregard a declaratory judgment or otherwise act in bad faith. The prayer for injunctive relief should therefore be dismissed.

## CONCLUSION

This Court should grant the Motion to Dismiss.

Dated:   July 18, 2016

Respectfully submitted,

/s/ Carolyn C. Pratt
Carolyn C. Pratt
NC Bar No. 38438
The University of North Carolina
P.O. Box 2688
Chapel Hill, NC 27515
Tel: (919) 962-3406
Fax: (919) 962-0477
Email: ccpratt@northcarolina.edu

/s/ Noel J. Francisco
Noel J. Francisco
Glen D. Nager
James M. Burnham
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina and the Board of Governors of the University of North Carolina*

## CERTIFICATE OF SERVICE

I certify that on July 18, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.


Dated:   July 18, 2016

/s/ Noel J. Francisco
Noel J. Francisco
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina and the Board of Governors of the University of North Carolina*