# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
       v. )
)     Case No. 1:16-cv-425
STATE OF NORTH CAROLINA; )
PATRICK MCCRORY, in his official )
capacity as Governor of North Carolina; )
NORTH CAROLINA DEPARTMENT )
OF PUBLIC SAFETY; UNIVERSITY )
OF NORTH CAROLINA; and BOARD )
OF GOVERNORS OF THE )
UNIVERSITY OF NORTH CAROLINA, )
)
    Defendants. )

## UNITED STATES' RESPONSE IN OPPOSITION TO UNC DEFENDANTS' MOTION TO DISMISS

Plaintiff United States of America ("United States") respectfully submits this response in opposition to the Motion to Dismiss of Defendants University of North Carolina and its Board of Governors (collectively, "UNC"). ECF No. 98.

## INTRODUCTION

Following the passage of Section 1.3 of North Carolina Session Law 2016-3, House Bill 2 ("H.B. 2" or "the Act"), the United States requested information from UNC to determine whether it intended to comply with H.B. 2 in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); and the Violence Against Women Act, 42 U.S.C. § 13925(b)(13) ("VAWA"). UNC's response confirmed

that it was required to comply with the Act and instructed its campuses to do so as well. The United States then sought voluntary compliance by requesting that UNC agree (1) not to comply with provisions of H.B. 2 that are irreconcilable with federal law, (2) to ensure that transgender persons may use multiple-occupancy bathrooms and changing facilities consistent with their gender identity, and (3) to retract any statements to the contrary. UNC declined this request. As a result, the United States exercised its statutory right to file suit in federal court to protect the rights of transgender people.

H.B. 2 requires public agencies, including UNC, to ensure that transgender people do not use sex-segregated bathrooms and changing facilities consistent with their gender identity unless they can produce an amended birth certificate. UNC's compliance with H.B. 2 violates the federal statutes listed above. Nevertheless, UNC attempts to placate both the State and its Legislature, which governs and controls UNC's Board of Governors, and the United States by claiming that although it is complying with H.B. 2, it has not, and will not, take steps to enforce the Act against its students and employees. UNC, however, cannot comply with H.B. 2 and federal law at the same time. UNC attempts to avoid this Court's jurisdiction by relying on a strained interpretation of H.B. 2 refuted by the State, Governor, and Legislature. And UNC's public statements construing H.B. 2 constitute, at best, deliberately confusing messages to different audiences about what policy governs facility access on campus. This Court, therefore, should adjudicate the United States' claims to provide necessary protection for the rights of UNC's students, employees, and visitors and hold UNC, a recipient of federal financial assistance, accountable for violations of its obligations under federal law.

2

**ARGUMENT**

UNC moves to dismiss the United States' claims, arguing that the United States (1) lacks the authority to bring a civil action pursuant to Title IX; (2) has not asserted justiciable claims; and (3) may not seek a permanent injunction and declaratory judgment concurrently. This Court should reject each of these flawed arguments.

## I.     The United States Has Authority To Bring Civil Actions Under Title IX

UNC erroneously asserts that Title IX does not enable the U.S. Department of Justice ("DOJ") to enforce the statute's requirements and DOJ's own Title IX regulations through civil actions in federal court. But Title IX's enforcement provision, 20 U.S.C. § 1682, adopts the established enforcement scheme for federal funding statutes first codified in Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.* ("Title VI"). Based on the plain language of Title IX, its implementing regulations, and related federal statutes, the United States has the authority to bring the instant lawsuit. To the extent the Court deems the statute ambiguous, it should defer to the United States' longstanding interpretation that Title IX contains such authority.

### A.     Under the Plain Language of Federal Statutes, the United States has Authority to Enforce Title IX's Protections through Litigation.

Congress consciously modeled Title IX's enforcement scheme on that of Title VI, which prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal funds. Both statutes condition an offer of federal funding on a promise by the recipient not to discriminate. Because of the close connection between the two statutes, Title VI legal precedent provides important guidance for the

3

application of Title IX. *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX . . . . The two statutes operate in the same manner . . . ."); *Cannon v. University of Chicago*, 441 U.S. 677, 694–98 (1979) (Congress intended Title IX to be interpreted and applied as Title VI has been). In fact, Title IX adopts verbatim the established enforcement structure of Title VI. *Compare* 20 U.S.C. § 1682 *with* 42 U.S.C. 2000d-1; *see also Cannon*, 441 U.S. at 706 n.40; 117 Cong. Rec. 30408 (1971); 118 Cong. Rec. 5807 (1972). Put simply, Title VI is the ultimate source for understanding the enforcement mechanism available under Title IX, and that mechanism includes enforcement by the Attorney General through litigation.

The common enforcement mechanism in Title VI and Title IX permits DOJ to remedy discrimination either by terminating federal financial assistance or "by any other means authorized by law." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. Courts have consistently interpreted the term "any other means authorized by law" in Title VI as providing civil enforcement authority to the United States. *See, e.g.*, *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983) ("Title VI clearly tolerates other enforcement schemes [besides termination of funding]" including "referral of cases to the Attorney General, who may bring an action"); *United States v. County of Maricopa*, 151 F. Supp. 3d 998, 1017–19 (D. Ariz. 2015) (Title VI authorizes the United States to bring suit); *cf. United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002) (The statutory language "take any other action authorized by law . . . expressly permits the Secretary to bring suit to enforce the [Family Educational Rights and Privacy Act] conditions in lieu of its administrative remedies."); *United States v. Baylor Univ. Medical Center*, 736 F.2d

4

1039, 1050 (5th Cir. 1984) ("We do not mean to imply that a federal agency seeking to enforce antidiscrimination provisions of Section 504 [of the Rehabilitation Act of 1973] must resort to administrative remedies. The statute expressly states otherwise: an agency may resort to 'any other means authorized by law'—including the federal courts.").

The history of federal enforcement of Title VI is consistent with this reading. Soon after the passage of Title VI, President Johnson directed the Attorney General, as the "chief law officer . . . charged with the duty of enforcing the laws of the United States," to assist federal departments and agencies in coordinating enforcement efforts under Title VI. *See* Exec. Order No. 11,247, 30 Fed. Reg. 12,327 (Sept. 24, 1965). In 1965, the Attorney General issued Guidelines for Title VI enforcement, which defined refusal or termination of federal funding to be the "ultimate sanction" and specified alternative measures, including lawsuits, that the federal government could undertake to secure compliance. DOJ, *Guidelines for the enforcement of Title VI, Civil Rights Act of 1964*, 28 C.F.R. § 50.3, at pt. I.B.1 (hereinafter, *DOJ Title VI Guidelines*) (issued Dec. 27, 1965). The Guidelines further specified that the United States may obtain court enforcement through:

> (1) a suit to obtain specific enforcement of assurances, covenants running with federally provided property, statements or compliance or desegregation plans filed pursuant to agency regulations, (2) a suit to enforce compliance with other titles of the 1964 Act, other Civil Rights Acts, or constitutional or statutory provisions requiring nondiscrimination, and (3) initiation of, or intervention or other participation in, a suit for other relief designed to secure compliance.

*Id.*

5

These Guidelines have for fifty years confirmed that "other means authorized by law" include lawsuits by the United States to enforce Title VI's bar on discrimination by federal funding recipients. When Congress passed Title IX in 1972, this interpretation was in effect. And when Congress incorporated into Title IX the enforcement scheme of Title VI, it indisputably understood that the Attorney General would have the authority to sue to enforce Title IX. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *cf. Texas Dep't of Housing & Comm. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2521 (2015) ("'If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation.'" (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012)).

UNC advances a series of arguments about Title IX that do not account for the precedent cited above and fail on their own terms.[1] First, there is no basis for UNC's interpretation of the phrase "other means authorized by law" to mean "*already*

---

[1] UNC's interpretation of Title IX (and, by extension, Title VI and other funding statutes similarly providing enforcement by "other means authorized by law") to preclude litigation by the United States produces an anomalous enforcement structure out of line with its sibling civil rights statutes and difficult to credit to Congress. It would permit suit by private parties to obtain compliance with nondiscrimination mandates, but deny the United States the same tool. And it would turn the "ultimate sanction" of terminating federal funding into the United States' primary method of enforcement, curtailing agency discretion to devise less disruptive methods for securing compliance when federal resources are being used to support discriminatory practices in programs otherwise worthy of support. Particularly given the consistent contrary interpretation of Title VI and other funding statutes, this Court should decline to adopt UNC's unsupported attempt to turn Title IX into an outlier. *See Branch v. Smith*, 538 U.S. 254, 281 (2003) ("it is . . . the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes").

Case 1:16-cv-00425-TDS-JEP    Document 128    Filed 08/11/16    Page 6 of 22

'authorized' by some *other* 'law.'"  *See* ECF No. 99 at 15  (Memorandum in Support of UNC's Motion to Dismiss).  To the contrary, UNC has written "already" and "other law" into the text to arrive at a novel reading that courts construing the same language in Title VI have rejected.

Second, and equally untenable, is UNC's argument that the phrase "other means authorized by law" should be limited because it falls under 20 U.S.C. § 1682, which is captioned "Federal administrative enforcement; report to Congressional committees" and not under 20 U.S.C. § 1683, which is captioned "Judicial review."  *Id.* at 16.  The captions are general: section 1682 describes means to enforce nondiscrimination mandates accompanying federal financial assistance; section 1683 describes means for aggrieved recipients to challenge action that terminates funding.  But these captions do not limit the statutory text beyond the reasonable meaning of the text itself.  *United States v. Quality Stores, Inc.*, 134 S.Ct. 1395, 1402 (2014).  Even UNC concedes that "other means authorized by law" are not limited to the federal administrative action suggested in the caption.  *See* ECF No. 99 at 15 (noting that the phrase includes, for example, proceedings under state or local law).  Congress adopted Title VI's language in the face of a longstanding interpretation of that language to authorize civil actions by the United States in federal court, and these captions do not reveal any intent to depart from that longstanding interpretation.  Certainly, nothing in them alone or in conjunction with the text of the provisions themselves support UNC's reading that section 1682 restricts federal Title IX enforcement efforts to administrative actions or that section 1683

7

provides the exclusive means by which the United States may participate in judicial proceedings to secure Title IX compliance.

Third, Title VI and Title IX are enforceable through litigation by the United States even though the words "Attorney General" are not explicitly contained in the statutes. *See* ECF No. 99 at 16–17 (citing civil rights statutes that authorize the Attorney General to file a civil action). Title VI and Title IX ban discrimination in a wide range of contexts and are enforced by a variety of federal agencies. It would be unnecessary and confusing for Congress to identify the head of only one of the many agencies responsible for enforcing these statutes. Although Title VI and Title IX do not specify lawsuits by the Attorney General by name, their broad language includes that authority. Indeed, by the late 1970s, the Attorney General's authority to sue under Title VI was beyond question, such that in litigation over whether private parties *also* could bring such suits, the Attorney General's authority to do so was simply assumed. *See, e.g.*, *Cannon*, 441 U.S. at 696-71. Even in these private suits, courts permit the United States to intervene as a matter of right. *See, e.g. Lopez v. Metro. Gov. of Nashville & Davidson Cty.*, No. 3-07-0799, 2008 WL 4831318, at \*7 (M.D. Tenn. Nov. 4, 2008); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 157 (S.D.N.Y. 2004).

Finally, Title VI and Title IX do not condition enforcement authority on "assurances" or "contracts." *See* ECF No. 99 at 17. While the existence of federal funding is a jurisdictional prerequisite to a claim under those statutes, the enforcement authority granted under the statutes is "any other means authorized by law," and not exclusively a claim in contract. *See Maricopa*, 151 F. Supp. 3d at 1017–19 (long-

standing precedent and DOJ's interpretation of Title VI, which is entitled deference, dictate that the United States may enforce Title VI irrespective of any contractual claim).[2]

### B. To the Extent that Title IX is Ambiguous, this Court Must Defer to DOJ Regulations Interpreting Title IX to Allow Judicial Enforcement.

Even if Title IX were ambiguous as to the ability of the Attorney General to bring enforcement litigation, which it is not, UNC's construction of her authority conflicts with the interpretation adopted through regulation by DOJ. Given the considerable deference an agency receives when construing the statute it administers, *see, e.g.*, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), DOJ's permissible construction of the statute must control. *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868–69 (2013) (*Chevron* deference applies to agency interpretation of statutory ambiguity that concerns the scope of agency's statutory authority).

DOJ's Title IX regulations explicitly adopt the enforcement procedures of Title VI, *see* 28 C.F.R. § 54.605, and DOJ has interpreted "any other means authorized by law" to permit civil actions to secure compliance. *See* 28 C.F.R. § 42.108(a)(1) (explicitly authorizing "[a]ppropriate proceedings . . . to enforce any rights of the United States under any law of the United States"); *DOJ Title VI Guidelines*, 28 C.F.R. § 50.3, at pt. I.B.1. This interpretation, which accords with how other federal agencies construe the enforcement authority vested by Title VI and Title IX, is entitled to deference. *A.R. ex rel. Root v. Dudek*, 31 F. Supp. 3d, 1369–71 (S.D. Fla. 2014) (DOJ reasonably interpreted

---

[2] In any event, UNC, as a condition of receiving funds from DOJ, has signed non-discrimination assurances and thus remains subject to suit based on its actions taken pursuant to H.B. 2. *See* ECF No. 2 ¶ 9.

Case 1:16-cv-00425-TDS-JEP    Document 128    Filed 08/11/16    Page 9 of 22

the phrase "by any other means authorized by law" to permit civil actions); *see*, *e.g.*, 34 C.F.R. §§ 106.71, 100.8(a) (Department of Education's adoption of Title VI regulatory procedures for effecting compliance with Title IX, including construing "any other means authorized by law" to include "a reference to [DOJ] with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States"). Simply put, DOJ's Title IX regulations are "*within the bounds of its statutory authority*" and are "a permissible construction of the statute." *City of Arlington*, 133 S. Ct. at 1868, 1874 (emphasis in original). Thus, "that is the end of the matter." *Id.* at 1875 (citation omitted).

## II. The United States' Claims Against UNC Are Justiciable.

UNC argues that the United States' claims are not justiciable and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1). A court should dismiss for lack of subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991). However, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the [district] court should resolve the relevant factual disputes only after appropriate discovery." *Kerns v. United States,* 585 F.3d 187, 193 (4th Cir. 2009).

UNC challenges this Court's subject matter jurisdiction on both standing and ripeness grounds. UNC's arguments turn on flawed legal reasoning and disputed facts about whether it enforces or threatens to enforce H.B. 2. Thus, under both Article III doctrines, UNC's arguments fail.

10

A.     **UNC's Justiciability Arguments Turn on an Implausible Interpretation of H.B. 2.**

UNC argues that H.B. 2 does not contain enforcement provisions and does not confer authority on the University to undertake enforcement, and therefore there is no possibility of enforcement.  Not true.  This reasoning requires this Court to accept the untenable premise that H.B. 2 does not command enforcement.  Yet the plain language of H.B. 2 states that public agencies, including UNC, "*shall require* multiple occupancy bathrooms or changing facilities . . . be designated for and *only used by* individuals based on their biological sex" and hence requires public agencies to deny transgender people access to facilities consistent with their gender identity, unless they can produce an amended birth certificate.  N.C. Session Law 2016-03, sec. 1.3 § 143-760(b) (emphasis added).  H.B. 2 is a self-executing directive from the State to its public agencies to carry out its discriminatory policy.  *See* ECF No. 122 (Tr. 112:21–22) ("The statute is a directive to . . . public agencies . . . to implement policies.") (statement by Legislature-Intervenors).  H.B. 2, which UNC confirms it is heeding, commands enforcement even if it does not expressly state the consequences for noncompliance.

Indeed, five of the seven statements UNC identifies as assurance that it will not enforce H.B. 2 are premised on this interpretation that H.B. 2 does not command enforcement.  *See* ECF No. 99 at 10–11.  The other two statements are irrelevant to this Court's justiciability analysis.  Whether UNC's President will ensure that complaints from transgender students or employees are addressed through its nondiscrimination policy has no bearing on whether H.B. 2 is in effect on UNC's campuses.  In any event,

this statement simply begs the question of whether UNC would consider it a *violation* of its nondiscrimination policy to prohibit or impede a transgender student or employee from using a multi-occupancy bathroom consistent with his or her gender identity. Furthermore, UNC's President's statement that she will not promulgate any guidelines or regulations "[p]ending a final judgment in this case," *id.* at 11, only further underscores the need for the Court to issue an injunction against UNC, as it is a promise explicitly limited to the duration of this litigation and suggests, by implication, that if UNC is dismissed from the case it will no longer be constrained from promulgating guidelines and regulations to enforce H.B. 2.

Moreover, UNC asks this Court to accept its representations that compliance with H.B. 2 is optional, that UNC has opted to comply only minimally, and it will not take further steps to implement H.B. 2 beyond what it has done already. *See* ECF No. 99 at 10. The Act itself and UNC's actions to date undermine these representations, and none deprives this Court of jurisdiction. Although it involved a First Amendment challenge, *N. Carolina Right to Life, Inc. v. Bartlett* is instructive on the influence of a state actor's promise not to enforce a statute irrespective of its plain language. 168 F.3d 705 (4th Cir. 1999). In *Bartlett,* the Fourth Circuit held that a defendant's "promise" to interpret a statute as not enforceable against a plaintiff's activity did not render a controversy non-justiciable because it was "no guarantee that the [defendant] might not tomorrow bring its interpretation more in line with the provision's plain language." *Id.* at 711.

The "promise" here is even more dubious. UNC has confirmed that as a public agency, it is bound by H.B. 2, is complying with H.B. 2, and will comply until this Court

"directs otherwise." ECF No. 76-2 (Memorandum from Margaret Spellings to Chancellors 1 (Apr. 5, 2016)). UNC is an arm of the State and the Board of Governors is selected by the State legislature. *See* N.C. Gen. Stat. Ann. §§ 116-3; 116-6; *see also Roberson v. Dale*, 464 F. Supp. 680, 689 (M.D.N.C. 1979) (UNC is an alter-ego of the State because, *inter alia*, UNC's "property and monies are [] State property, wholly within the control of the legislature.") (citing N.C. Gen. Stat. Ann. § 116-1). Yet the Legislature, Governor, and State have denounced UNC's interpretation of H.B. 2 and represented to this Court that UNC "cannot unilaterally avoid enforcing or complying with H.B. 2." ECF No. 54 (Tr. 12:3–10) (statement by the Governor and State); *see also* ECF No. 122 (Tr. 112:21–22) (statement by Legislature-Intervenors).[3] To the extent UNC's President has expressed reluctance to carry out all of H.B. 2's mandates, her governance authority exists at the pleasure of the Board, which may rescind the authority given to the President or Chancellors at any time. *See Bd. of Governors of Univ. of N. Carolina v. U.S. Dep't of Labor*, 917 F.2d 812, 814 (4th Cir. 1990) (citing N.C. Gen. Stat. Ann. § 116-13). Because UNC's interpretation cannot be reconciled with H.B. 2's mandatory terms and, whether on its own initiative or at the direction of the State or Legislature, UNC could change course at any time absent an order from this Court, there is a credible threat of enforcement. *Bartlett*, 168 F.3d at 711 (A "litigation position that [defendant] will voluntarily refrain from enforcing the statute according to its plain

---

[3] Indeed, if UNC were not bound to enforce H.B. 2, it would seem unnecessary to send an official memorandum to the Chancellors of every UNC campus shortly after H.B. 2 was passed explaining how the Act applies to UNC facilities.

13

language" is not a valid defense); ECF No. 76-2 at 3 ("[UNC] is required to fulfill its obligations under the law unless or until the court directs otherwise.").

**B.    UNC is Complying With and Enforcing H.B. 2.**

UNC attempts to cast enforcement in the narrowest of terms to call into doubt the United States' standing and the ripeness of this matter.  UNC argues that the United States has not shown that the University enforces H.B. 2 because there are no allegations that UNC has responded to transgender people using bathrooms consistent with their gender identity by disciplining them, filing a police report, seeking civil or criminal punishment, or physically removing them from the bathroom.  ECF No. 99 at 12. However, this argument disregards the meaning of "enforce."  The word "enforce" means not only to "compel obedience to," but also "to give force or effect to [] a law . . . ." ENFORCE, Black's Law Dictionary (10th ed. 2014).

It is undisputed that UNC has taken steps to give effect to H.B. 2's mandates. UNC has informed students, employees, and visitors that its bathrooms and changing facilities are covered by H.B. 2 and has affirmed that campuses are required to comply with the Act's mandates.  UNC's President issued a memorandum widely distributed on campus directing that, in compliance with H.B. 2, "University institutions *must require* every multiple-occupancy bathroom and changing facility *to be designated for* and *used only by* persons based on their biological sex."  ECF No. 76-2 at 2 (emphasis added). That memorandum further directs University institutions to "[p]rovide notice of the Act to campus constituencies" and "fully meet their obligations under the Act."  *Id.* at 1–2. According to UNC, "the University is required to fulfill its obligations under the law

unless and until the court directs otherwise." *Id.* at 2; *see also* ECF No. 76-3 (Letter from Margaret Spellings, President, Univ. of N.C., to Shaheena Ahmad Simons, Acting Chief, U.S. Dep't of Justice, Civil Rights Div., Educ. Opportunities Section 4 (Apr. 13, 2016) (further affirming that the University is "required . . . to comply" with H.B. 2 and declaring that, in UNC's view, H.B. 2 is "presumptively valid and constitutional")).

UNC's President instructed the Chancellors to comply with H.B. 2 by "[d]esignat[ing] and label[ing] multiple-occupancy bathrooms and changing facilities for single-sex use with signage." ECF No. 76-2 at 3. UNC cannot obfuscate its affirmative compliance with H.B. 2 by suggesting that its compliance is meaningless because the signage existed prior to the Act's passage. *See* ECF No. 118 at 9–11. Even without a change to the physical labels, UNC has already changed their meaning, by explaining that those designations comply with H.B. 2. *See* ECF No. 76-2 at 2. Moreover, UNC President further directed Chancellors to comply with H.B. 2 by "providing notice of the Act to campus constituencies . . . ." *Id.* With this backdrop, those designations signify the exclusion of UNC's transgender students and employees from bathrooms and changing facilities that correspond with their gender identities. UNC's exclusionary mandate is not theoretical—it is concrete, actual, and felt by every transgender person working and studying at or visiting UNC's seventeen campuses. *See, e.g.,* ECF No. 76-6 (THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, MESSAGE FROM UNIVERSITY LEADERS: UPDATE ON HOUSE BILL 3 (Apr. 8, 2016) ("[T]here is no question that many in our LGBTQ community and many others are feeling unwelcome, unsafe, and unhappy in the communities where they live and work.")).

Moreover, UNC has taken steps to ensure that multiple-occupancy bathrooms are only used by people entitled to use them under H.B. 2. UNC has admitted that it "provid[ed] information about the location of single-occupancy bathrooms" to people on campus. ECF No. 118 at 10. Indeed, one Chancellor sent a notice that H.B. 2 applies to the campus and included information about single-use restrooms and changing facilities. *See* ECF No. 76-6 at 4 ("We have added and will continue to add public gender-neutral single-use restrooms and changing facilities throughout our campus and we will be adding additional signage."). Again, in the context of H.B. 2's recent passage and UNC's statements of the Act's applicability, this information is reasonably interpreted to confirm that the signage on single-sex facilities refers to "biological sex," as defined in H.B. 2, and as an instruction to transgender individuals to use single-occupancy facilities and not multiple-occupancy facilities, as H.B. 2 commands.[4]

UNC's litigation position—that it has disclaimed enforcement—should be rejected. On May 4, 2016, the United States notified UNC that it was not in compliance with Title VII, Title IX, and VAWA and requested that UNC immediately agree not to comply with provisions of H.B. 2 that are irreconcilable with federal law, ensure that transgender persons may use multiple-occupancy bathrooms and changing facilities consistent with their gender identity, and retract any statements to the contrary. ECF No.

---

[4] *See* ECF No. 76-39 ¶ 18 ("[T]he Chancellor sent out a list of these bathrooms to the entire student body immediately after H.B. 2 passed, so now everyone, including the men who harassed me and others like them, knows that these bathrooms are where gender nonconforming students are supposed to go.") (witness declaration).

2 ¶ 28.  Such action would have demonstrated a refusal to give continuing force or effect to H.B. 2.  The steps that UNC has actually taken reveal a different approach.

The cases UNC cites as support for its assertion that there is not a credible threat it will enforce H.B. 2 do not command a different result under either the standing or ripeness doctrines.  Cases involving criminal statutes[5] that discuss threats of arrest or prosecution are hardly applicable to a self-executing directive from the State.  Unlike criminal statutes, which inherently require prosecution or arrest to be enforced, H.B. 2's requirements are directed at the State's public agencies and H.B. 2 remains non-moribund so long as those requirements are followed.  Indeed, several cases UNC relies upon involve criminal statutes that were enacted long ago, but had not been prosecuted in many years.  In those cases, courts appropriately determined that a prosecutor's disclaimer to not prosecute plaintiffs coupled with the long history of nonenforcement made the claims nonjusticiable.  *See, e.g.*, *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986).  However, H.B. 2 is "newly enacted . . . [and i]t would be unreasonable to assume that the General Assembly adopted [H.B. 2] without intending that it be enforced." *Mobil Oil Corp. v. Attorney General of Com. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (quoting *American Booksellers Association v. Commonwealth,* 802 F.2d 691, 694 n.4 (4th Cir.1986), *vacated on other grounds,* 488 U.S. 905 (1988)).  This is particularly true in this case, where UNC has already taken steps to give effect to H.B. 2's mandates, with

---

5  *See, e.g., Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014); *Poe v. Ullman,* 367 U.S. 497 (1961) (plurality opinion); *Cong. of Indus. Organizations v. McAdory*, 325 U.S. 472 (1945); *Doe v. Duling*, 782 F.2d 1202 (4th Cir. 1986); *Moore v. Asheville*, 290 F. Supp. 2d 664 (W.D.N.C. 2003).

17

real impact on students and employees. The State, Governor, and Legislature have affirmatively represented to this Court that UNC must enforce H.B. 2—and because those bodies control the composition of UNC's Board of Governors, they may direct more emphatic measures at any time to "require" that multiple occupancy bathrooms or changing facilities be used only by individuals based on their "biological sex." *See* N.C. Session Law 2016-03, sec. 1.3 § 143-760(b). Under these circumstances, transgender people have well-founded, objective fears of enforcement with even more vigor. *See id.*

At best, UNC's arguments about compliance amount to disputed facts insufficient to support finding this case nonjusticiable as a matter of law. To allow this school year to proceed under a cloud of uncertainty regarding whether H.B. 2 is or is not UNC's policy would impose considerable hardship on UNC's transgender students and employees, who continue to experience sex discrimination because of UNC's compliance with the Act. Unsurprisingly, testimony from individual students, UNC employees, and others who attend events on campus suggests precisely this result—people are confused, and remain genuinely fearful of enforcement on UNC's campuses. *See* ECF No. 76-34 ¶¶ 12–13; 76-39 ¶ 23; 76-40 ¶ 16; 76-44 ¶ 17; 76-45 ¶ 17 (witness declarations). Students who choose to use facilities consistent with their gender identity do so at their own peril—knowing they are in violation of State law and risk having a classmate or colleague report them to a University official, campus police, or local law enforcement. *See* ECF No. 76-40 ¶ 16 ("My university has not put guards in front of restrooms to enforce H.B. 2, but I do not know what the university would do if someone reported me for violating H.B. 2 on campus. If that were to happen, I am worried I might be charged with trespassing, which

could result in a criminal record that would hurt my future employment and graduate school prospects."); ECF No. 76-45 ¶ 12 ("I was afraid that someone would try to haul me out if I used a women's restroom because of H.B. 2."). These fears are not simply subjective and baseless, as UNC asserts in its motion. *See, e.g.,* ECF No. 122 (Tr. 113:6–9) ("[T]he statute clarifies for whoever is enforcing that provision about how the indecent exposure law or the peeping law or the trespass law ought to apply.") (statement by Legislature-Intervenors); ECF No. 76-6.

UNC's compliance with H.B. 2 demonstrates that it has not taken the laissez-faire approach to enforcement it attempts to paint for this Court. And these steps, and their impact, demonstrate that this approach to enforcement does not suffice to support a motion to dismiss on justiciability grounds. At the very least, there are factual disputes regarding UNC's actions, and this Court should decline to dismiss claims against UNC until these factual disputes are addressed at trial. *See Kerns,* 585 F.3d at 193.

## III. This Court Should Deny UNC's Request To Dismiss The United States' Prayer For A Permanent Injunction.

This Court should also reject UNC's request to dismiss the United States' prayer for a permanent injunction. UNC asserts that a declaratory judgment is an adequate remedy for any violation of federal law because the Court "must presume" that UNC, as a government actor, will comply with the declaratory judgment. ECF No. 99 at 19. UNC also argues that such dismissal is appropriate "even at the pleadings stage." *See id.* at 18. The United States, however, asked this Court for a permanent injunction to prevent UNC from *further* violations of federal law. *See* ECF No. 2 ¶ D. As discussed *supra,* UNC

19

was notified it was not in compliance with federal laws and still has not come into compliance despite the United States' formal request. *See id.* ¶¶ 28–29. This certainly supports a request for injunctive relief.

The disparate cases stitched together by UNC in support of its argument are inapposite here.[6] To the extent that any of UNC's cited cases are instructive, they suggest that courts consider whether to grant a plaintiff's request for permanent injunctive relief after reaching the merits because such relief involves a fact-based inquiry.[7] Therefore, it would be wholly inappropriate to dismiss the United States' prayer for a permanent injunction against UNC.

## CONCLUSION

For the foregoing reasons, the Court should deny UNC's Motion to Dismiss.

---

[6] *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164–66 (2010) (reversing and remanding due to impermissible injunction that prohibited partial deregulation and nationwide planting of genetically-altered crop); *Foster v. Wells Fargo Bank, N.A.*, No. 3:14-cv-00017, 2014 WL 3965059, at *7 (W.D. Va. Aug. 13, 2014) (dismissing plaintiff's request for permanent injunction or rescission of foreclosure sale because damages constituted an adequate remedy-at-law and equitable relief would be inappropriate); *Bryant v. Blanton*, 463 F. Supp. 155, 157–58 (W.D. Tenn. 1979) (where *plaintiff* wins a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), then the relief must necessarily be decided as well).

[7] *See, e.g., Douglas v. Jeannette*, 319 U.S. 157, 160, 165 (1943) (affirming Third Circuit's reversal on merits after district court conducted a trial, held city ordinance invalid, and enjoined enforcement of criminal prosecutions for violation of ordinance); *Poe v. Gerstein*, 417 U.S. 281 (1974) (affirming district court's declaratory judgment that state statute was unconstitutional and denying injunction after reaching the merits); *Nat'l Audobon Soc'y v. Dept. of Navy*, 422 F.3d 174, 200 (4th Cir. 2005) (reviewing scope of injunction for abuse of discretion after district court granted summary judgment to plaintiff regarding national wildlife refuge).

This the 11th day of August, 2016.

Respectfully submitted,

RIPLEY RAND
United States Attorney
Middle District of North Carolina
United States Department of Justice
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
Telephone: (336) 333-5351
E-mail: ripley.rand@usdoj.gov

VANITA GUPTA
Principal Deputy Assistant Attorney
General

SHAHEENA SIMONS
Chief, Educational Opportunities Section

DELORA L. KENNEBREW
Chief, Employment Section

COREY L. STOUGHTON
Senior Counsel

LORI B. KISCH
WHITNEY PELLEGRINO
Special Litigation Counsel

DWAYNE J. BENSING
TOREY B. CUMMINGS
SEAN R. KEVENEY
ALYSSA C. LAREAU
JONATHAN D. NEWTON
CANDYCE PHOENIX
ARIA S. VAUGHAN
TARYN WILGUS NULL
Trial Attorneys
United States Department of Justice
Civil Rights Division

/s/ Aria S. Vaughan
NY Bar Number: 5044748
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4092
Aria.Vaughan@usdoj.gov

*Counsel for Plaintiff*

21

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:16-CV-00425 |
| | ) |
| STATE OF NORTH CAROLINA; | ) |
| PATRICK MCCRORY, in his official | ) |
| capacity as Governor of North Carolina; | ) |
| NORTH CAROLINA DEPARTMENT OF | ) |
| PUBLIC SAFETY; UNIVERSITYOF | ) |
| NORTH CAROLINA; and BOARD OF | ) |
| GOVERNORS OF THE UNIVERSITY OF | ) |
| NORTH CAROLINA, | ) |
| | ) |
|     Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using CM/ECF.

Respectfully submitted,

/s/ Aria S. Vaughan
NY Bar Number: 5044748
Trial Attorney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-4092
Email: Aria.Vaughan@usdoj.gov

*Counsel for Plaintiff*

22