# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

STATE OF NORTH CAROLINA, *et al.*,

*Defendants*.

Case No. 1:16-cv-00425

---

JOAQUÍN CARCAÑO, *et al.*,

*Plaintiffs*,

v.

PATRICK MCCRORY, in his official capacity as Governor of North Carolina, *et al.*,

*Defendants*.

Case No. 1:16-cv-00236

## CONSOLIDATED REPLY BRIEF IN SUPPORT OF UNC DEFENDANTS' MOTIONS TO DISMISS

Federal courts enjoin the *enforcement* of laws, not the *existence* of laws. Here, the UNC Defendants have not enforced or threatened to enforce the Public Facilities Privacy and Security Act (Act) at all. Instead, they have maintained the same bathroom signage and the same policies forbidding discrimination against transgender individuals as existed before the Act. Whatever the legal merits or practical wisdom of passing and enforcing the Act, there is, quite simply, no justiciable controversy against the UNC Defendants.

In contrast, numerous other state institutions do have a stake in the legality of the Act because they enacted it, are threatening to enforce it, and stand ready to fully defend it—including the State itself, which Plaintiffs concede is an appropriate Title IX defendant. There is thus no practical reason, as well as no legal basis, to force the UNC Defendants into a case about whether *other* state officials can enforce a law that *other* state officials enacted. Yet each day the UNC Defendants remain here, they are diverted from their core mission of educating students and instead forced to expend significant administrative, monetary, and other resources defending a lawsuit in which they have no stake. These already-substantial burdens, moreover, are about to increase dramatically: Plaintiffs have now served sweeping document requests which no doubt mark the beginning of an expansive, expensive discovery process.

Respectfully, the UNC Defendants should not be forced to shoulder this load. Rather, as they have repeatedly explained, given the absence of a concrete controversy against *them,* they should be dismissed from this case forthwith and allowed to begin the school year focused on educating students, not litigating the disputes of others.

# I.    THE CLAIMS AGAINST THE UNC DEFENDANTS ARE NOT JUSTICIABLE OR RIPE

A challenge to a statute is justiciable and ripe only against defendants who enforce the statute or threaten to do so.  After all, "[a]n injunction enjoins a defendant" (from doing something), "not a statute" (from saying something).  *Okpalobi v. Foster*, 244 F.3d 405, 426 n.34 (5th Cir. 2001) (*en banc*).  The UNC Defendants neither enforce nor threaten to enforce the Act, and thus do nothing for the Court to enjoin.  Plaintiffs nevertheless struggle to keep them in this case, but their efforts fail.

## A.    The Credible-Threat Requirement Fully Applies Here

The *Carcaño* Plaintiffs contend that the credible-threat requirement "typically" applies only to challenges to "*criminal*" laws.  *Carcaño* Opp. 8.  That is wrong.  Courts routinely apply this bedrock requirement to dismiss challenges to everything from civil statutes (*Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995)), to state bar regulations (*Wilson v. State Bar*, 132 F.3d 1422, 1428 (11th Cir. 1998), to university policies (*Rock for Life-UMBC v. Hrabowski*, 411 Fed. Appx. 541, 548 (4th Cir. 2010)).  Indeed, the *Carcaño* Plaintiffs have it backwards.  Because threats of criminal prosecution cause *more* harm than threats of civil enforcement, it is *harder*—not *easier*—to establish standing "when the only sanctions at stake *are not criminal*."  13B Charles Alan Wright et al., *Fed. Practice & Procedure* § 3532.5 (3d ed 2016) (emphasis added).

The *Carcaño* Plaintiffs next claim that the credible-threat requirement is "inapt" where "sensitive interests" such as "privacy" and "dignity" are at stake.  *Carcaño* Opp. 7.  But Article III does not include a "sensitive interests" exception.  To the contrary, courts

2

have applied the credible-threat requirement to dismiss challenges to contraception laws (*Poe v. Ullman*, 367 U.S. 497 (1961)), cohabitation laws (*Doe v. Duling*, 782 F.2d 1202 (4th Cir. 1986)), and sodomy laws (*D.L.S. v. Utah*, 374 F.3d 971 (10th Cir. 2004))—all laws that, no less than the Act, affect core "privacy" and "dignity" interests.

Finally, the *Carcaño* Plaintiffs argue that a defendant's "voluntary cessation" of a challenged practice "moots an action" only if it is "absolutely clear" that the practice will not recur. *Carcaño* Opp. 15. But the voluntary-cessation doctrine presupposes a defendant who "settle[s] into a continuing practice" that causes injury and then "abandon[s]" that practice in response to litigation. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 n. 5 (1953). Here, the University never enforced the Act to begin with. The voluntary-cessation doctrine does not apply when there is no practice to voluntarily cease. That doctrine is, moreover, an "exceptio[n] to mootness," not an exception to standing or ripeness. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000). It is thus an "immense and unacceptable stretch" to use the doctrine "as a substitute" for the "present or threatened injury upon which initial standing must be based." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). Here, Plaintiffs never had standing in the first place and the voluntary-cessation therefore doctrine does not apply.

### B. The University's Statements Do Not Make These Lawsuits Justiciable

UNC officials have made public statements confirming that the Act covers the University but, at the same time, explaining that the University lacks both the authority

3

and intention to enforce it. *U.S.* Mem. 3–5; *Carcaño* Mem. 3–5. Plaintiffs assert that these statements send a "message" that the Act is in effect (*Carcaño* Opp. 14) and "give effect" to the Act (*U.S.* Opp. 14). Neither claim establishes a concrete controversy.

*First*, a defendant "enforces" a law (in the sense relevant to Article III) only if it imposes a tangible harm—something that "amounts to an Article III injury"—upon violators. *SBA List v. Driehaus*, 134 S. Ct. 2334, 2343 (2014). For example, the Fourth Circuit dismissed a challenge to a university policy in *Rock for Life*, 411 Fed. Appx. at 548, because the plaintiffs did not "face a credible threat of disciplinary action." Similarly, the Ninth Circuit dismissed a challenge to a university policy in *Lopez v. Candaele*, 630 F.3d 775, 792 (9th Cir. 2010), because the plaintiff did not face "a specific, credible threat of adverse government action." Here, the UNC Defendants do not do (or threaten to do) *anything* to transgender individuals who use facilities consistent with their gender identity. They do not physically remove them, discipline them, seek civil or criminal penalties against them, or make notations in their student files. They thus do not "enforce" the Act and do not belong in this litigation.

*Second*, mere statements about a law's applicability do not cause Article III injury. For example, courts have held that the following do not cause injury: (1) a prosecutor's announcement that using contraceptives "would constitute [an] offens[e]" (*Poe*, 367 U.S. at 501); (2) police officers' promises to "investigate complaints" of cohabitation (*Doe*, 782 F.2d at 1205), (3) an agency's "letter" advising pharmacies that it is "illegal" to deny services because of "religious or moral beliefs" (*Stormans, Inc. v. Selecky*, 586 F.3d 1109,

4

1124 (9th Cir. 2009)), and (4) an agency's "guidance" that certain conduct violates rules of judicial ethics (*ARLPAC v. Feldman*, 504 F.3d 840, 850 (9th Cir. 2007). If these statements did not cause Article III injury, the University's statements do not do so either.

Indeed, the arguments for justiciability here are far *weaker* than in these cases. In its public statements, the University has *affirmatively disclaimed* both the authority and the intent to take enforcement action. *See U.S.* Mem. 10–11; *Carcaño* Mem. 11–12. Emails sent by UNC officials and received by the *Carcaño* Plaintiffs (*Carcaño* Opp. 13) confirm that the Act "does not contain any provisions concerning enforcement" (*Carcaño* ECF No. 67-5), and "does not confer authority" "to undertake enforcement actions" (*Carcaño* ECF No. 67-11). Given these assurances, any claim that the University's statements establish a credible threat of disciplinary action is baseless.

*Finally,* the United States is currently deploying these very principles in *Texas v. United States*, No. No. 16-54 (N.D. Tex.), a case in which several states challenge federal guidance directing employers and schools to allow transgender individuals into facilities consistent with their gender identity. In a brief filed by the same attorneys appearing before this Court in *North Carolinians for Privacy*, No. 16-845, the United States argues that those plaintiffs "lack standing" because there is no "imminent enforcement action" in which the United States seeks to "sanction or penalize" specific conduct. Ex. A at 7, 13. It further argues that "any injury" "depends on the initiation of some kind of enforcement action," and that, "in the absence of such an enforcement action," any ruling would be "an advisory opinion." *Id.* at 14. The United States adds that federal agencies have

5

neither imposed nor threatened to impose any "legal consequences" upon those who violate the guidance (*id.*), and even notes that "the agencies' mere articulation" of their "interpretation" of the law "does not injure [the challengers] in any way" (*id.* at 15).

The United States' own reasoning confirms that Plaintiffs "lack standing" to sue the UNC Defendants here: (1) There is no "imminent enforcement action" in which the University seeks to "sanction or penalize" any conduct; (2) the University does not impose or threaten to impose "legal consequences" upon transgender people; and (3) the University's "mere articulation" of its policies "does not injure [transgender people] in any way." The UNC Defendants should be dismissed from the case.

## C. The University's Bathroom Signs Do Not Make These Lawsuits Justiciable

The United States contends that the University causes injury simply by maintaining the same bathroom signs ("men" and "women") that existed before the Act's passage, since transgender people might interpret these signs as an "exclusionary mandate." *U.S.* Opp. 15. This argument is specious.

To begin, notwithstanding numerous complaints and briefs filed in these cases—including the Second Amended Complaint in *Carcaño*, filed on August 15—there is no allegation or evidence that transgender individuals on UNC campuses believe that the same bathroom signs meant one thing before the Act and now mean something else after it. This is dispositive, because courts resolve motions to dismiss on the basis of pleadings and evidence, not on the basis of speculation in "briefs in opposition." *Sadler v. Pella Corp.*, 146 F. Supp. 3d 734, 759 n.11 (D.S.C. 2015).

6

But in any event, the United States' interpretation is unreasonable. President Spellings has repeatedly explained that the University has no intent to take enforcement action, that she has no intent to adopt regulations requiring transgender students to use particular bathrooms, and that University officials will investigate any complaints that a transgender student has been forced to use a bathroom inconsistent with his or her gender identity. *U.S.* Mem. 11. It is simply implausible to interpret bathroom signs, against the backdrop of these assurances, as a threat to take disciplinary action if a transgender person uses the bathroom consistent with his or her gender identity.

Finally, as discussed above, mere statements about a law's applicability do not by themselves impose Article III injury. Thus, even if the University's bathroom signs *were* (wrongly) construed as a statement about the Act, they would not establish a justiciable controversy, since that construction is not backed by a credible threat of enforcement.

**D.   Subjective Fears Of Enforcement Do Not Make These Lawsuits Justiciable**

Plaintiffs also claim that some students and staff *fear* enforcement of the Act. *U.S.* Opp. 19; *Carcaño* Opp. 6. That, too, does not establish justiciability.

To start, Plaintiffs are wrong on the law. It takes "an objective threat" rather than a "subjective fear" to establish standing. *Doe*, 782 F.2d at 1206. For example, in *Doe*, a plaintiffs' "subjective fear of prosecution" for cohabitation in violation of Virginia law could not "substitute" for a "specific present objective harm or a threat of specific future harm." *Id.* (quotation marks omitted). That was so even though the plaintiffs had "abstained from sexual intercourse . . . for fear of prosecution." *Id.* at 1204. Here too,

7

Plaintiffs have not shown the objective threat of enforcement that Article III requires.

Plaintiffs are also wrong on the facts. Even the United States' own declarants understand that no threat of enforcement exists. One student declares that UNC officials "acknowledged that they had no enforcement mechanism." C.W. Decl. ¶ 23. Another declares that a UNC official explained that her school "had no plans of enforcing H.B. 2" and that the student "start[ed] using women's restrooms" as a result. H.K. Decl. ¶¶ 15, 17. At most, some declarants express *uncertainty* about possible enforcement. *See, e.g.*, A.T. Decl. ¶ 16 ("*I do not know* what would the university would do") (emphasis added). But standing requires "*certainly impending*" injury (*Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013)); uncertainty about possible injury does not suffice. The United States' own evidence thus confirms the absence of a controversy here.

## E. Speculation About Future Enforcement Does Not Make These Lawsuits Justiciable

Plaintiffs contend that the Act grants the University enforcement authority and that the University's contrary interpretation of it is wrong. *U.S.* Opp. 11; *Carcaño* Opp. 12. This argument is mistaken and irrelevant. Justiciability turns on whether the defendant *actually* enforces or threatens to enforce a statute, not on whether it *could* or even *should* do so. In *Doe*, the state executive clearly had both the authority to prosecute cohabitation offenses and the duty to "take care that the [cohabitation statute] be faithfully executed" (Va. Const. art. V, § 7, cl. 1). Yet its failure to *exercise* that enforcement power meant a challenge to the cohabitation statute was not justiciable. 782 F.2d at 1206. Likewise, regardless of whether the University has the power or even the duty to enforce the Act, its

8

refusal to do so means that claims against it are not justiciable.

The United States speculates that "UNC could change course at any time." *U.S. Opp.* 13. But that just underscores the absence of jurisdiction *now*. Courts routinely hold that no justiciable controversy exists where a defendant agrees not to enforce a statute—even though, in every such case, the defendant *could* theoretically change course later. *See, e.g.*, *Poe*, 367 U.S. at 508 ("tacit agreement" not to enforce); *CIO v. McAdory*, 325 U.S. 472, 475 (1945) ("agreed not to enforce"). If the UNC Defendants *do* change course—which they will not—Plaintiffs are free to sue them then.

The United States also muses that the Legislature or Governor might someday pressure the University to enforce the Act. *U.S.* Opp. 18. But standing requires injury that is both "certainly impending" and "traceable" to the defendant." *Amnesty Int'l*, 133 S. Ct. at 1150. Speculation about what the Legislature or Governor might do or how the University might respond does not establish that injury is "certainly impending," and injury caused by the Legislature or Governor is not "traceable" *to the UNC Defendants*.

### F. Plaintiffs' Cases Confirm That These Lawsuits Are Not Justiciable

Plaintiffs cite a series of cases purportedly showing that these lawsuits are justiciable. But the cases they invoke do no such thing.

*First*, in the *Carcaño* Plaintiffs' most prominent case—*G.G. v. Gloucester Cty. Sch. Bd.*, 2016 WL 1567467 (4th Cir. 2016)—a credible threat of enforcement *did* exist. "[T]he school principal informed G.G. that he could no longer use the boys' restroom *and would be disciplined if he did*." *G.G. v. Gloucester Cty. Sch. Bd.*, 132 F. Supp. 3d 736,

741 (E.D. Va. 2015) (emphasis added). Nothing like that has happened here.

*Second*, most of the *Carcaño* Plaintiffs' cases likewise involve a genuine threat of enforcement. In one, the plaintiff showed that "[her] health information ha[d] [already] been, or will imminently be, disclosed" under the challenged regulation. *Citizens for Health v. Leavitt*, 428 F.3d 167, 176 n.9 (3d Cir. 2006). In four others, officials "ha[d] not suggested that the [challenged] law will not be enforced" (*Virginia v. Am. Bookseller Ass'n*, 484 U.S. 383, 392 (1988)), "ha[d] not given any assurances that [they] will refrain from [enforcement]" (*VSHL, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001), "ha[d] not disclaimed any intention of exercising" "enforcement authority" (*Mobil Oil v. Att'y Gen.*, 940 F.2d 73, 75–76 (4th Cir. 1991)), or offered "no assurances" "plaintiffs will not be prosecuted" (*Aid for Women v. Foulston*, 441 F.3d 1101, 1110 (10th Cir. 2006)). In three further cases, plaintiffs faced tangible penalties for violating the challenged law, and nobody suggested that the government lacked the intent to impose those penalties. *Liberty Univ. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013); *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1016–17 (9th Cir. 2013); *Whitney v. Heckler*, 780 F.2d 963, 968 n.6 (11th Cir. 1986). All of these cases are irrelevant here because the University *has not* threatened to penalize transgender individuals and *has* disclaimed any intent to do so in the future.

*Third*, the *Carcaño* Plaintiffs' remaining cases involve statutes that *themselves* cause injury by chilling the exercise of First Amendment rights. *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968) (law prohibiting teaching of evolution); *VNOM v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2011) ("chilling" effect of campaign-finance law "enough" to

cause injury); *Meltzer v. Bd. of Pub. Instr.*, 548 F.2d 559, 572–73 (5th Cir. 1977) ("effect" of school-prayer policy "sufficient" to cause injury). The principle that the mere "chilling effect of a statute" "may warrant judicial intervention" has long been limited to "rare cases involving core First Amendment rights." *Doe*, 782 F.2d at 1206; *see Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) ("standing [and] ripeness requirements" are "relaxed" in "First Amendment cases"). Since this lawsuit does not involve the First Amendment, Plaintiffs cannot establish standing on the basis of an abstract chilling effect.

The United States' sole case, *NCRL, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999), is inapposite for the same reason. *NCRL* reasoned that the "mere existence" of the challenged restriction on political speech "risk[ed] chilling First Amendment rights" (*id.* at 711); but as just explained, such reasoning does not apply outside the First Amendment context. Moreover, there *was* a "credible threat of prosecution" in *NCRL*: The State indicated that the statute prohibited the plaintiff's speech and there was no evidence of "any intention of refraining from prosecuting." *Id.* at 711. Here, by contrast, the UNC Defendants have made plain from the outset that they are not enforcing the Act.

G. **Plaintiffs Are Not Entitled To Jurisdictional Discovery**

Plaintiffs finally argue that the Court should delay resolving the motion to dismiss until after discovery. *U.S.* Opp. 10; *Carcaño* Opp. 2. This, too, is wrong.

Plaintiffs rely on the principle that a court should allow discovery where jurisdiction is "inextricably intertwined" with the merits. *U.S.* Opp. 10; *Carcaño* Opp. 2. But the *jurisdictional* issue is whether the University enforces or threatens to enforce the

11

Act; the *merits* issue is whether enforcing the Act would violate federal law. The two issues are separate, not intertwined. That is precisely why, in *Doe*, the Fourth Circuit dismissed a challenge to Virginia's cohabitation statute for lack of a credible threat of enforcement, without considering whether enforcing that statute would violate the Constitution. 782 F.2d at 1206. Plaintiffs' argument for discovery therefore fails.

More generally, discovery is not warranted where "the pleadings [lack] specific facts" establishing jurisdiction. *Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993); *see Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) (plaintiff whose "complaint is deficient" "is not entitled to discovery"). That is precisely the case here, where Plaintiffs never claim that the University penalizes or threatens to penalize transgender individuals for using bathrooms consistent with their gender identity. They instead allege, at the most, that President Spellings' guidance states that the Act applies on campus and (in the case of the *Carcaño* Plaintiffs) that some people fear enforcement. *U.S.* Compl. ¶¶ 20–29; *Carcaño* Opp. 6. But as discussed above, neither statements about a law nor subjective fears of enforcement satisfy Article III. *Supra* 3–8.

Finally, jurisdictional discovery is also impermissible where plaintiffs rely on "bare allegations" to dispute the defendant's evidence or where discovery would "in all likelihood" "waste the parties' time and resources." *Sportrust Assocs. Int'l v. Sports Corp.*, 304 F. Supp. 2d 789, 794 (E.D. Va. 2004). Here, the UNC Defendants have introduced extensive evidence showing that they do not intend to take disciplinary action under the Act; Plaintiffs, in contrast, do not even allege otherwise. Further, Plaintiffs

12

already have access to the University's public statements; the United States has already interviewed (and filed declarations from) transgender individuals on UNC campuses; and the *Carcaño* Plaintiffs already know whether UNC officials have tried to control which bathrooms they use. In short, Plaintiffs have in their hands all of the information necessary to determine whether UNC officials are enforcing or threatening to enforce the Act. Their inability to allege any such enforcement confirms that further discovery will not reveal enforcement where none exists; hence, requiring discovery would only "waste the parties' time and resources." *Id.*

## II. THE UNITED STATES LACKS A CAUSE OF ACTION TO ENFORCE TITLE IX

The United States may bring a lawsuit to enforce a statute only if the statute grants it a cause of action to do so. Title IX, however, does not. *U.S.* Mem. 14–17.

The United States claims that Title IX creates a cause of action when it states that federal agencies may obtain compliance by "termination" of funding or "*any other means authorized by law*." 42 U.S.C. § 1682 (emphasis added). But the phrase "any other means authorized by law" does not *itself* create a new enforcement mechanism. Rather, it allows the United States to invoke any "other means" that are "authorized" by some "law." The United States cites no "law" that "authorize[s]" it to bring a lawsuit to enforce Title IX. Thus, no cause of action exists under the plain language of the statute.

The United States rejoins that, because Title IX permits enforcement actions "by private parties," it *must* permit enforcement actions by the United States. *U.S.* Opp. 6 n.1. But that simply does not follow. *First*, civil-rights laws *frequently* grant greater rights to

13

private parties than to the United States. *See, e.g.*, 42 U.S.C. § 1983 (cause of action for private parties only); *id.* §§ 2000e-5 (Title VII) (broader cause of action for private parties than for United States). *Second*, Title IX has "an unmistakable focus" on "individual[s]." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–91 (1979). That focus supports "infer[ring] a private remedy" (*id.* at 691); it does not support inferring a governmental one. *Finally*, the United States (unlike private parties) may terminate Title IX funds; it thus does not *also* need a cause of action to secure compliance.

Relatedly, the United States suggests that, because it may sue to enforce contractual promises to comply with Title IX, it may also sue to enforce Title IX itself. *U.S.* Opp. 9 n.2. But that, too, does not follow. "[F]ederal common law" grants the United States across-the-board authority to sue to enforce federal contracts (*United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980)); but neither federal common law nor any statute grants the United States similar authority to sue to enforce federal statutes (*United States v. Solomon*, 563 F.2d 1121, 1129 (4th Cir. 1977)). Accordingly, "suits to enforce contractual antidiscrimination provisions" *are* "means authorized by law" (*Cannon*, 441 U.S. at 721 (White, J., dissenting)); suits to enforce Title IX are *not*. This distinction matters, because a contract claim (unlike a statutory claim) must satisfy contract-law standards, overcome contract-law defenses, and abide by contract-law limits on remedies. *See M.R. v. Dist. of Columbia*, 841 F. Supp. 2d 262, 267 (D.D.C. 2012).

The United States also claims that it may bring lawsuits to enforce Title IX because some courts (though not the Fourth Circuit) have held that it may sue to enforce

14

similarly worded statutes (though not Title IX). *U.S.* Opp. 4–5. But in addition to addressing *other* statutes, the cases the United States cites do not say what it claims. Rather, three involved lawsuits to enforce *contractual assurances*, not the underlying statute. *See United States v. Maricopa*, 151 F. Supp. 3d 998, 1022 (D. Ariz. 2015) ("United States has the power to . . . prevent violations of Maricopa County's contractual obligations"); *United States v. Miami Univ.*, 294 F.3d 797, 809 (6th Cir. 2002) ("United States may enforce the Universities' 'contractual' obligations"); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1050 (5th Cir. 1984) (United States "permitted to sue to enforce . . . compliance agreement"). And the final one states in dicta that "the Attorney General may . . . bring an action," *without specifying* whether it means an action to enforce a contract or an action to enforce the statute. *Nat'l Black Police Ass'n v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983). That case, moreover, predates *Alexander v. Sandoval*, 532 U.S. 275 (2001), in which the Supreme Court adopted a presumption against implied causes of action and held that an agency "*may not create* a [cause of action] that Congress has not." *Id.* at 291 (emphasis added).

Finally, the United States claims that, to the extent the statute is ambiguous, the Court should defer to the Department of Justice's view that a cause of action exists. *U.S.* Opp. 5–6, 9–10. But it is an "axio[m]" of statutory interpretation that a federal statute creates a "right of action" *only if* Congress speaks "unambiguously" and "with a clear voice." *Clear Sky Wash LLC v. Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014). Agencies may not evade this rule by invoking deference, because a regulation cannot

15

"conjure up" a "cause of action that has not been authorized by Congress."  *Sandoval*, 532 U.S. at 291; *see Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 731 (6th Cir. 2013) (Sutton, J., concurring) ("presumption against implied causes of action" "take[s] precedence over" deference to "agency views").  Thus, to the extent Title IX is ambiguous, the Court should reject rather than allow the cause of action asserted here.

## III. THE *CARCAÑO* PLAINTIFFS' CLAIMS AGAINST PRESIDENT SPELLINGS VIOLATE SOVEREIGN IMMUNITY

The *Carcaño* Plaintiffs have sought to amend their complaint to drop the Board of Governors and Chairman Bissette as defendants and add President Spellings in their place. *Carcaño* ECF No. 116.  To overcome sovereign immunity, however, the *Carcaño* Plaintiffs must establish that President Spellings (1) has a "specific duty to enforce the [Act]" (*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)), and (2) has "enforced [or] threatened to enforce" the Act (*McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010)).  *See Carcaño* Mem. 17.  They have done neither.  President Spellings does not have a specific duty to enforce the Act, because the Act does not confer any enforcement authority.  In any event, President Spellings has not enforced or threatened to enforce the Act; quite the opposite, she has disclaimed the intent to do so. President Spellings therefore enjoys sovereign immunity.

## IV. PLAINTIFFS ARE NOT ENTITLED TO PERMANENT INJUNCTIONS

A plaintiff is not entitled to an injunction if a declaratory judgment would suffice. Plaintiffs have not pled facts suggesting that declaratory relief would be inadequate here. Their prayers for permanent injunctions against the UNC Defendants should be

16

dismissed. *U.S.* Mem. 17–19; *Carcaño* Mem. 17–20.

Plaintiffs contend that they need not allege facts establishing the inadequacy of declaratory relief. *U.S.* Opp. 20; *Carcaño* Opp. 18. But under the Civil Rules' "basic pleading requirement[s]," a plaintiff must "set forth facts sufficient to allege each element of his claim." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002). One element of a claim to injunctive relief is inadequacy of declaratory relief. Plaintiffs have not alleged that, so their prayers for injunctions must be dismissed. Mem. 19–20.

The *Carcaño* Plaintiffs cite cases purportedly holding that courts may grant injunctions regardless of the sufficiency of declaratory relief. *Carcaño* Opp. 19. These citations do not overcome the Supreme Court's repeated holdings (*Carcaño* Mem. 19) that an injunction should issue *only* if a declaration would not suffice. For example, in *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987), the court held solely that the trial court had "jurisdiction" to hear a lawsuit; it "express[ed] no views" about whether the plaintiff would be "entitled" to "injunctive relief." In *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980), the court never addressed the argument that an injunction is unnecessary where a declaration would suffice. In *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993), the plaintiff could get an injunction because "monetary relief alone [was] inadequate" to redress her injury; that case thus confirms, rather than refutes, that inadequacy of other remedies is a prerequisite to an injunction. The remaining cases—*Osborn v. Bank of United States*, 22 U.S. 738 (1824), and *Ex parte Young*, 209 U.S. 123 (1908)—arose long before the Declaratory Judgment Act of 1934.

17

The United States, for its part, asserts that the UNC Defendants "did not come into compliance" after being "notified" of the United States' position. *U.S.* Opp. 20. That claim is inaccurate. The UNC Defendants have never enforced the Act, and thus have always been in "compliance" with federal civil-rights laws *even as* the United States now interprets them. That claim is also irrelevant. A defendant's refusal to comply with a non-binding letter from a federal agency obviously does not suggest that the defendant would refuse to comply with a declaration issued by this Court.

## CONCLUSION

The Complaints should be dismissed against the UNC Defendants.

18

Dated:   August 17, 2016

Respectfully submitted,

/s/ Carolyn C. Pratt

Carolyn C. Pratt
NC Bar No. 38438
The University of North Carolina
P.O. Box 2688
Chapel Hill, NC 27515
Tel: (919) 962-3406
Fax: (919) 962-0477
Email: ccpratt@northcarolina.edu

/s/ Noel J. Francisco

Noel J. Francisco
Glen D. Nager
John M. Gore
James M. Burnham
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina, the Board of Governors of the University of North Carolina, and W. Louis Bissette, Jr., in his Official Capacity as Chairman of the Board of Governors of the University of North Carolina*

## CERTIFICATE OF SERVICE

I certify that on August 17, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.


Dated:   August 17, 2016

/s/ Noel J. Francisco
Noel J. Francisco
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina, the Board of Governors of the University of North Carolina, and W. Louis Bissette, Jr., in his Official Capacity as Chairman of the Board of Governors of the University of North Carolina*